**CORROSION RESISTANT MATERIALS CO., Plaintiff,**

v.

**STEELITE, INC., Oxhandler Structural Enterprises, Inc., Chris Anderson Erecting Corp. and John Doe Corporation, Defendants.**

Civ. A. No. 84–2337.

United States District Court, D. New Jersey.

July 20, 1988.

As Amended Aug. 17, 1988.

**408**

Toner, Dibenedetto & Schiffenhaus by John F. Crane, Roseland, N.J., for plaintiff.

Smith, Stratton, Wise, Heher & Brennan by William J. Brennan, III, Suzanne M. McSorley, Princeton, N.J., for defendant Steelite, Inc.

Gary J. Langer, New York City, for defendant Oxhandler Structural Enterprises, Inc.

OPINION

WOLIN, District Judge.

In this antitrust action defendant Steelite, Inc. renews its motion for partial summary judgment on Counts One and Four of the Complaint based on the recent decision of the United States Supreme Court in *Business Electronics Corp. v. Sharp Electronics Corp.*, — U.S. —, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). For the following reasons defendant's motion is granted.

## I. FACTUAL BACKGROUND

### A. The Parties

Defendant Steelite, Inc. ("Steelite") is a Pennsylvania corporation engaged in the manufacture and sale of materials for the construction industry. Specifically, Steelite manufactures roll-formed metal roofing and siding panels which are generally used in the construction of warehouses, manufacturing plants and other commercial or industrial facilities. Steelite also manufactures ventilation equipment for such facilities and resells the fasteners and other equipment needed to install its roofing and siding panels.

Defendant Oxhandler Structural Enterprises, Inc. ("Oxhandler") is a construction contractor engaged primarily in the business of packaging and providing the labor, material and engineering services necessary to erect both the structural components of buildings and the exterior finishes for such structures. Oxhandler has been an authorized dealer-erector of Steelite's building materials since the mid–1970's.

Plaintiff Corrosion Resistant Materials Co. ("CRMC") is a dealer engaged in the business of buying, selling and distributing corrosion resistant building materials. Between 1977 and September 20, 1983 (at which point Steelite terminated its relationship with CRMC), CRMC was an authorized distributor of Steelite's roll-formed metal roofing and siding panels.

### B. The Steelite Distribution and Marketing System

Steelite sells its building materials through authorized distributors who fall into two categories: materials-only distributors, like CRMC, and dealer-erectors, like Oxhandler. The materials-only distributors, as their name suggests, provide material (*i.e.*, metal roofing and siding panels and fasteners) to their customers who, in turn, make other arrangements to install (*i.e.*, "erect") the materials. On the other hand, dealer-erectors provide materials, labor, engineering services and/or installation expertise to their customers.

The ultimate consumers of Steelite products likewise fall roughly into two classes: those who are maintaining and/or repairing existing structures (the "maintenance" market) and those who are building new facilities (the "new construction" market). Although Steelite sells the same materials through its distributors in both the maintenance and the new construction markets, these materials are usually sold differently in each market.

In the maintenance market, Steelite materials are usually sold to the maintenance department of the owner of a commercial or industrial facility or to a contractor who has been awarded a maintenance or repair contract. In the new construction market, however, roofing and siding are usually sold on a competitive bid basis through architects and engineers to contractors.[1] In both the maintenance and the new construction markets, Steelite's sales representatives and its distributors make every effort to identify pending or planned projects on which Steelite materials can be used and to persuade those responsible for the purchasing decision to choose Steelite products rather than products manufactured by one of Steelite's competitors.

## C. Steelite's Pricing and Quotation Systems

Steelite periodically provides its distributors with price lists which set forth the price for standard Steelite products (*i.e.,* standard base metals and gauges, profiles, colors and coatings) and it also directs distributors to consult Steelite's headquarters in Pittsburgh for pricing on engineered sales or for the price of "non-standard, non-stocked" items (*i.e.,* items for which Steelite does not ordinarily stock the raw materials or for which Steelite must schedule a special run at its mill).

As a general rule, when a project will require standard Steelite products only,

Steelite distributors can prepare and submit bids to supply these materials without consulting Steelite. If the Steelite distributor is awarded a contract on such a project, said distributor need only place an order with Steelite for the necessary materials. However, those projects which require non-standard materials, engineering services or more than 100 squares of roofing or siding (one "square" is equal to 100 square feet) are treated differently. If the order is for more than 100 squares Steelite encourages, and for those orders involving engineered or non-standard materials it requires, the distributor to consult Steelite's Inside Sales Department or its Engineered Sales Department to obtain a price quotation.

The Steelite Inside Sales Department provides "unit price quotations" to Steelite distributors. A unit price quotation is the price quotation for a specified quantity of a particular material (that specification requires reference to the type and gauge of base metal, the profile of the panel, the color, the coating, if any, and the finished lengths of the panels). The Engineered Sales Department, on the other hand, provides "engineered lump sum" price quotations to Steelite distributors. To obtain an engineered lump sum quotation from Steelite, the distributor must provide Steelite with the job construction and siding plans. These plans are reviewed by Steelite engineers who then prepare a price quotation based on determinations of the necessary materials required to complete a given job.[2]

Steelite will provide unit prices or engineered lump sum prices for any job. However, once a distributor requests an engineered price on a particular job, Steelite will not quote (or sell) at a price calculated purely on a unit price basis because, as already noted, the preparation of the engineered price in and of itself increases costs to Steelite.

---

1. As a result of this market structure, Steelite distributors must sometimes "sell" Steelite products twice. First they must persuade the architect or engineer (who will specify which materials must be used on the job) to specify a Steelite product or an "approved equal" for the roofing or siding. Then, when the job is let for bids, the

distributor must persuade the general contractor or its subcontractor that he should use a Steelite product and not an "approved equal" on the project.

2. This quotation also reflects cost of engineering services provided by Steelite.

## D. The Termination of CRMC

CRMC began as a materials-only distributor of Steelite products in 1977. Sometime thereafter Steelite and CRMC entered into an oral distribution arrangement. Purportedly, this contract was terminable at will by either party. Subsequently, the relationship between Steelite and CRMC began to deteriorate.[3]

The situation between Steelite and CRMC worsened when, in April 1983, three Steelite distributors (including CRMC and Oxhandler) submitted construction plans and specifications for an airplane hangar construction job (the "IBM Job") and asked Steelite to prepare an engineered lump sum price quotation for the siding required. On or about May 10, 1983, Steelite forwarded the price quotation to the appropriate distributors.

Lecesse Bros., the general contractor on the IBM Job, did not award the siding sub-contract to any of the Steelite distributors. Instead, Lecesse apparently awarded the siding contract to Independent Metal Systems, Inc. ("IMS"), which was not a Steelite distributor.

Subsequently, on or about July 28, 1983, Oxhandler called Steelite's Engineered Sales Department and told them that IMS had asked Oxhandler to provide Steelite materials for the IBM Job. Oxhandler requested that Steelite reprice its engineered lump sum quotation by deducting certain auxiliary items.[4] It appears that on the same day, CRMC called Steelite's Inside Sales Department and requested a unit price quotation (as opposed to an engineered price quotation) on certain material for the "Independent Metals Job."[5]

Steelite soon discovered that CRMC had obtained both an engineered lump sum and a unit price on the same job. Basically, this was "the straw that broke the camel's back," and during the month of August 1983, Steelite made the decision to terminate CRMC's distributorship. Thus, on or about September 30, 1983, Steelite notified CRMC of its termination.

## II. PROCEDURAL HISTORY

On June 14, 1984, CRMC filed a five count complaint against defendants Steelite, Oxhandler, Chris Anderson Erecting Co.[6] and John Doe Corp. The first count alleged violations by all defendants of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 15. The second count claimed defendant Steelite violated the Robinson–Patman Act, 15 U.S.C. § 13. The third count contends that the remaining defendants violated the Robinson–Patman Act. The fourth count alleges that all defendants violated the New Jersey Antitrust Law, N.J.Stat.Ann. 56:9–3. The fifth count avers that all defendants committed the common law tort of unlawful interference with plaintiff's business relationship.

On October 31, 1984, Steelite moved for summary judgment on count two of the complaint, which motion was subsequently withdrawn. Thereafter, CRMC moved for partial summary judgment as to liability but not damages on the first count only insofar as that count alleged a Sherman Act violation. Steelite also cross-moved for partial summary judgment as to the first, second and fourth counts. Oxhandler joined with Steelite in defense against CRMC's partial summary judgment motion, but it did not join in Steelite's own motions for partial summary judgment. In an Opinion and Order dated May 1, 1986 (and filed as of May 2nd), Judge Barry denied both CRMC's motion for partial summary

---

**3.** According to Steelite, CRMC paid its bills late, placed unrealistic production demands on Steelite and generally abused Steelite personnel.

**4.** In light of Steelite's policy not to provide unit prices once it had quoted engineered prices, Oxhandler represents that it did not ask for unit prices on the IBM Job.

**5.** The IBM Job was also known as the Independent Metals Job, and it appears that the Steelite employee who received the CRMC request had not worked on the Oxhandler engineered lump sum price quotation for the IBM Job, and thus did not recognize the material requested as material for a job in which Steelite had already quoted an engineered lump sum.

**6.** Defendant Chris Anderson Erecting Co. was voluntarily dismissed by CRMC per Stipulation and Order dated August 8, 1985.

judgment and also Steelite's cross-motion for partial summary judgment as to the fourth count and the Sherman Act claims of the first count.

Presently, and in light of the Supreme Court's May 2, 1988 opinion in *Business Electronics Corp. v. Sharp Electronics Corp.,* — U.S. ——, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), Steelite now renews its motion for summary judgment as to counts one and four of the complaint.

## III. DISCUSSION

### A. Summary Judgment Standard—*Matsushita*

Rule 56(b) of the Federal Rules of Civil Procedure provides, in pertinent part that "[a] party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." And upon receipt of such motion by the court, Fed.R.Civ.P. 56(c) provides that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law....

The moving party has the burden of establishing that there exists no genuine issue of material fact. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once that burden is met, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). In particular, the non-moving party is required to set forth spe-

cific facts which show that a genuine issue exists; said party cannot rest upon the mere allegations or denials of its pleadings. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. The *Liberty Lobby* Court also observed that a dispute involving a material fact is "genuine" only "if the evidence is such that a reasonable jury would return a verdict for the non-moving party." *Id.*[7]

Furthermore, in considering a summary judgment motion, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. at 1356–57. Although the summary judgment hurdle is a difficult one to meet, in an antitrust suit it is by no means insurmountable:

> To survive a motion for summary judgment ... a plaintiff seeking damages for a violation of § 1 [of the Sherman Act] must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently. [*Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)]. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. See [*First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 280, 88 S.Ct. 1575, 1588, 20 L.Ed.2d 569 (1968)].

*Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. at 1357. *But see Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (summary judgment should be used sparingly in complex antitrust litigation).

### B. The Initial Denial of Summary Judgment—*Cernuto*

As already noted, defendant's motion for summary judgment as to Count 1 has pre-

---

**7.** Accordingly, in *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141 (3d Cir.1987), the Third Circuit noted:
At the summary judgment stage, a 'judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial.' ... However, if the evidence is 'merely colorable' or is 'not significantly probative,' summary judgment may be granted....
812 F.2d at 144 (quoting *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2511).

viously been considered and denied by Judge Barry. *See Corrosion Resistant Materials Company v. Steelite, Inc.,* Civil No. 84–2337, slip op. at 6–11 (D.N.J.1986).[8] Judge Barry, in denying defendant's motion, found that although there was no direct evidence of improper motives on the part of the defendant, there existed genuine issues of material fact whether a jury could infer a *per se* violation of section 1 of the Sherman Act. *Corrision Resistant Materials,* slip op. at 9.[9] In determining the standards for establishing a *per se* violation, Judge Barry relied on the Third Circuit's opinion in *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3d Cir.1979):

> Given the alleged anti-competitive and arguably horizontal impact of United's [*i.e.,* the manufacturer's] decision, and given the price orientation of the alleged conspiracy, we cannot say that a *per se* violation of the [Sherman Act] may not be shown. If Cernuto [*i.e.,* the terminated distributor] can prove at trial that United, Lappin and Famous conspired to protect Famous [*i.e.,* a non-terminated distributor] from price competition by Cernuto, and that United and Lappin terminated Cernuto at Famous' request and in pursuit of a price related end, then it can prevail on a price-fixing theory notwithstanding its failure to show any impact on competition [in the relevant product market].

*Corrosion Resistant Materials,* slip op. at 11 (quoting *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d at 170). The *Cernuto* court, although noting that proof of either defendant's unilateral marketing decision or that price was not the defendant's sole motivation would probably render the *per se* rule inappropriate, overturned the district court's grant of summary judgment because "in reviewing a grant of summary judgment—we must assume that the facts are otherwise." 595 F.2d at 170.

It is clear, therefore, that under the *Cernuto* formulation a plaintiff need not prove the existence of an agreement in order to avoid a defendant's motion for summary judgment. Even though a "mere coincidence of factors" or "mere evidence of an opportunity to conspire" would not withstand the scrutiny of a summary judgment motion under *Cernuto,* Judge Barry concluded that "some evidence of concerted action" would defeat such a motion. *Corrosion Resistant Materials,* slip op. at 10 (citing *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 763 F.2d 1482 (3d Cir.1985); *Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469 (3d Cir.1985); *Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367 (3d Cir.1985)). Accordingly, Judge Barry held that a plaintiff could establish *per se* violation of § 1 of the Sherman Act simply by showing that the object of a conspiracy was the price-related end of the elimination of a price-cutting competitor of a non-terminated distributor.

**C. Defendant's Renewed Motion for Summary Judgment—*Business Electronics***

In *Business Electronics Corp. v. Sharp Electronics Corp.,* the Supreme Court acknowledged that there existed:

> [A] conflict in the Courts of Appeals regarding the proper dividing line between the rule that vertical price restraints are illegal *per se* and the rule that vertical nonprice restraints are to be judged under the rule of reason.

—— U.S. at ——, 108 S.Ct. at 1517 (footnote omitted). On the one hand, the Fifth, Seventh, Eighth and Tenth Circuits applied the rule that in order to avail himself of the *per se* rule, a plaintiff must establish that between the manufacturer and dealer defendants there existed an "express or im-

---

**8.** Judge Barry also denied plaintiff's cross-motion for summary judgment on Count 1. She held that even if an inference of impermissible discrimination had occurred, plaintiff produced no evidence definitively establishing a *per se* conspiracy between defendants Steelite and Oxhandler. *Corrosion Resistant Materials,* slip op. at 5–6.

**9.** In arriving at this conclusion, Judge Barry placed strong emphasis on a series of letters in which defendant Steelite expressed concern as to competition between its distributors in the New York metropolitan area. *See infra* notes 10 and 11 (setting forth relevant portions of said letters).

plied agree[ment] to set ... prices at some level, though not a specific one." *Id.* at ——, 108 S.Ct. at 1518 (citing *Business Electronics Corp. v. Sharp Electronics Corp.,* 780 F.2d 1212, 1218 (5th Cir.1986)). On the other hand, the Third and Ninth Circuits have disagreed; these circuits followed the rule that a plaintiff can prevail on a price-fixing theory on the lesser showing that defendants acted in pursuit of a price-related end. *See Business Electronics,* —— U.S. at ——, 108 S.Ct. at 1517. The Supreme Court, in affirming the Fifth Circuit (and thereby effectively overruling the Third and Ninth Circuits), held that "a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." *Id.* at ——, 108 S.Ct. at 1515.

In light of the Supreme Court's holding in *Business Electronics,* defendant Steelite has renewed its motion for summary judgment for the reason that *Cernuto,* upon which Judge Barry relied, has been reversed. *Business Electronics,* —— U.S. at ——, 108 S.Ct. at 1517, n. 1. Steelite maintains that plaintiff cannot, as a matter of law, show that the contract or conspiracy between Steelite and Oxhandler included an express or implied agreement to maintain resale prices. In response, plaintiff contends that the reversal of *Cernuto* aside, the *Business Electronics* case did not impose a burden on the plaintiff to prove that an express agreement on price existed, but rather, that a plaintiff need only prove "an express or implied agreement to set resale prices at some level." —— U.S. at ——, 108 S.Ct. at 1517.

### D. Vertical Restraints of Trade—*GTE Sylvania, Monsanto* and *Business Electronics*

 Vertical agreements on resale prices are *per se* illegal. *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). Within the context of vertical nonprice restraints, however, the scope of *per se* illegality is much narrower. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). This distinction is based on the Supreme Court's conclusion "that vertical nonprice restraints ha[ve] not

been shown to have such a 'pernicious effect on competition' and to be so 'lack[ing] [in] ... redeeming value' as to justify *per se* illegality." *Business Electronics,* —— U.S. at ——, 108 S.Ct. at 1519 .(quoting *GTE Sylvania,* 433 U.S. at 58, 97 S.Ct. at 2561 (quoting *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958))). Moreover, the *Business Electronics* court noted that:

> We have been solicitous to assure that the market-freeing effect of our decision in *GTE Sylvania* is not frustrated by related legal rules. In *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 763, 104 S.Ct. 1464, 1470 [79 L.Ed.2d 775] (1984), which addressed the evidentiary showing necessary to establish vertical concerted action, we expressed concern that '[i]f an inference of such an agreement may be drawn from highly ambiguous evidence, there is considerable danger that the doctrin[e] enunciated in *Sylvania* ... will be seriously eroded.' See also *id.,* at 761, n. 6, 104 S.Ct. at 1469, n. 6. We eschewed adoption of an evidentiary standard that 'could deter or penalize perfectly legitimate conduct' or 'would create an irrational dislocation in the market' by preventing legitimate communication between a manufacturer and its distributors. *Id.* at 763, 764, 104 S.Ct. at 1470.

—— U.S. at ——, 108 S.Ct. at 1520.

 Thus, in light of *GTE, Sylvania, Monsanto,* and most recently, *Business Electronics,* it is clear that in the instant case plaintiff must be able to point to *some* evidence that defendants Steelite and Oxhandler conspired to fix prices. In support of this assertion, plaintiff sets forth the following facts: (1) Oxhandler complained to Steelite that there were too many distributors in the New York metropolitan area and that materials-only distributors were getting a "free ride" on Oxhandler's promotional efforts on Steelite's behalf in the new construction market; (2) Oxhandler's subsequent request for an exclusive distributorship of Steelite products in the metropolitan New York area; (3) a meeting, in May 1983, between Steelite and Ox-

handler where representatives of each company met at Newark Airport to discuss Oxhandler's complaints; (4) a letter to Oxhandler memorializing Steelite's policy of providing job names on certain price inquiries;[10] and (5) Steelite's termination of CRMC as a distributor.[11]

It was essentially these facts, as applied under the *Cernuto* rule, that caused Judge Barry to determine that plaintiff may have been unlawfully terminated. However, even considering all of the above-noted facts, this Court notes that plaintiff has failed to allege, as required under *Business Electronics*, that Steelite in any way forced its distributors to sell at a certain price level. Further, there is no allegation, or subsequent proof, of any Steelite/Oxhandler price agreement following the termination of CRMC, at which point Oxhandler became an exclusive dealer of Steelite products in the New York metropolitan area.[12] Thus, merely because Steelite terminated CRMC, even if due to an agreement with Oxhandler, CRMC has failed to establish the existence of any genuine issue of fact such that summary judgment may now be avoided. To hold otherwise in the instant case, in light of *Business Electronics*, "would threaten to dismantle the doctrine of *GTE Sylvania*." —— U.S. at ——, 108 S.Ct. at 1521.

Finally, this Court notes that plaintiff's argument that plaintiff intends to establish a violation of the Sherman Act by introducing at trial circumstantial evidence as to an implied agreement between Steelite and Oxhandler clearly runs counter to the logic, and indeed the law, of *Business Electronics*. The Supreme Court acknowledged that:

> Any agreement between a manufacturer and a dealer to terminate another dealer who happens to have charged lower prices can be alleged to have been directed against the terminated dealer's "price cutting." In the vast majority of cases, it will be extremely difficult for the manufacturer to convince a jury that its motivation was to ensure adequate services, since price cutting and some measure of service cutting go hand in hand.

—— U.S. at ——, 108 S.Ct. at 1521. Further, the Court recognized that:

> [A] manufacturer that agrees with one dealer to terminate another for failure to provide contractually-obligated services, exposes itself to the highly plausible claim that its real motivation was to terminate a price cutter.

*Id.*

Despite these inherent "risks," however, the *Business Electronics* Court *did not* agree with "the proposition that vertical price agreements generally underlie agreements to terminate a price cutter [because] [t]hat proposition is simply incompatible with the conclusions of *GTE Sylvania* and *Monsanto*." *Id.* at ——, 108 S.Ct. at 1523. Moreover, the Court noted that the concept of eliminating a "free-rider," as noted in *GTE Sylvania* and *Monsanto*, actually accomplishes a beneficial economic result. —— U.S. at ——, 108 S.Ct. at 1522–23. Accordingly, in light of the fact that plain-

---

**10.** In pertinent part, this letter provides

> In an effort to minimize competition with other Steelite distributors in your area, the following steps have been taken. Both [CRMC] and Long Island Tinsmith Corp. will be required to give Steelite's Inside Sales a job name on all inquiries over 100 squares.

Letter from Steelite to Oxhandler dated June 14, 1983 (Exhibit F to Plaintiff's Motion for Summary Judgment before Judge Barry).

**11.** CRMC was terminated as of a letter dated September 20, 1983, which provides in pertinent part:

> Steelite has found that certain of its distributors are competing against each other with increasing frequency on the same jobs. This has resulted in confusion in the market place

[sic] and a loss of business for Steelite and its distributors.

Letter from Steelite to CRMC (Exhibit B to plaintiff's Brief in Opposition to defendant's current Motion for Summary Judgment).

**12.** In an attempt to address this deficiency, plaintiff moved to amend the Final Pre–Trial Order by including the following paragraph:

> (W) This agreement between Steelite and Oxhandler to terminate plaintiff included an implied understanding that Oxhandler would set its prices at a level satisfactory to Steelite.

This motion was denied at oral argument, however, in light of plaintiff's failure to show "manifest unjustice". *Ely v. Reading Co.,* 424 F.2d 758, 764 (3d Cir.1970).

tiff does not make the factual showing necessary to support the inference of an agreement to set prices, either express or implied, defendant's motion for summary judgment as to Count 1 of the Complaint must be granted.[13]

### E. State Law Claims

The New Jersey Antitrust Act, N.J.Stat. Ann. § 56:9–3, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." Moreover, Section 56:9–18 of the Act provides that it "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, uniformity in the laws of those states which enact it." *See also Pomanowski v. Monmouth County Board*, 89 N.J. 306, 312–13, 446 A.2d 83 (1982) (federal caselaw under Sherman Act useful for developing analytical framework for restraint-of-trade question under New Jersey Antitrust Act).

Thus, in light of the fact that plaintiff does not challenge the articulated policy that the New Jersey Antitrust Act should be interpreted "in harmony" with the interpretations of the Sherman Act, this Court is similarly constrained to grant summary judgment in favor of defendant as to Count 4 of the Complaint. *See Glasofer Motors v. Osterlund, Inc.*, 180 N.J.Super. 6, 23, 433 A.2d 780 (App.Div.1981) (no *per se* rule applied to vertical nonprice restrictions).

### IV. CONCLUSION

In light of the fact that *Business Electronics Corp. v. Sharp Electronics Corp.* appears to overturn *Cernuto, Inc. v. United Cabinet Corp.*, and for all of the reasons above-noted, defendant Steelite, Inc.'s motion for summary judgment as to Counts 1 and 4 of the Complaint is hereby GRANTED. As noted by plaintiff, Count 5 (unlawful interference with a business relationship) still remains at issue and the par-

ties shall proceed to trial thereon as of August 22, 1988.

An appropriate order shall issue.

---

**13.** In passing, this Court also notes that John Grochowski, CRMC's president, acknowledged that Steelite had never placed any price restrictions on CRMC and also that he had no knowledge as to any possible agreement between Steelite and Oxhandler. *See* Exhibit A to McSorley Affidavit dated June 2, 1988.