704 A.2d 1364

E Z SOCKETS, INC., PLAINTIFF, v. BRIGHTON-BEST SOCKET
SCREW MFG. INC., PERRY ROSENSTEIN AND LAKSHMI
PRECISION SCREWS LTD., DEFENDANTS.

Superior Court of New Jersey
Chancery Division
Union County
General Equity Part

Decided June 21, 1996.

*Melvin Greenberg,* for plaintiff (*Greenberg Dauber & Epstein,* attorneys; *Mr. Greenberg* and *Jeffrey S. Berkowitz,* on the brief).

*Lauren M. Hollender,* for defendants (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys; *Douglas S. Eakeley,* of counsel; *Ms. Hollender,* on the brief).

BOYLE, P.J. CH.

The central issue in this case is whether an agreement between a distributor and a manufacturer that requires the manufacturer

to discontinue selling products to a few of the distributor's competitors, is an unlawful vertical restraint of trade and/or a tortious interference with prospective and continuing economic relations? This case uniquely applies the fundamental principles of vertical price restraints enunciated by the United States Supreme Court, New Jersey courts and federal courts.

The essential facts are not in dispute.

Both Brighton and E Z are redistributors of socket screw products in competition with one another.[1] Neither Brighton nor E Z engages in any manufacturing. Instead, Brighton and E Z purchase socket screw products in bulk and either redistribute them in bulk or repackage them into smaller quantities for distribution to distributors who in turn sell to end users. Whereas ninety five percent (95%) of Brighton's business is socket screws, E Z's entire business is to sell to distributors a complete line of socket screw products. However, Brighton is a much larger company than E Z, and is known to everyone in the socket screw industry as holding the number one position, with E Z being number two, Brighton's main competitor.

Both Brighton and E Z sell foreign-made shoulder screws instead of American made screws because foreign-manufactured socket screws and foreign suppliers offer the same materials at a cheaper, more competitive price.

Defendant, Perry Rosenstein, founded Brighton in 1967 with a partner to fill what they perceived to be a need for an independent source of supply for socket screws within the American market. Mr. Rosenstein presently serves as the President and majority shareholder of Brighton.

Defendant, Lakshmi, is a company located in India that manufacturers and sells shoulder screws, among other products. In 1986, Mr. Rosenstein first met B.P. Jain, Chairman and Managing

---

[1] Socket screws are fastener products which are used to join or assemble parts of industrial machinery utilized by the aerospace, automobile, aircraft and other industries.

Director of Lakshmi, and his son Rajesh Jain. At that time, Lakshmi had a small manufacturing facility located in India. Soon after, Mr. Rosenstein encouraged Mr. Jain to consider expanding Lakshmi and begin exporting to the United States. In the next few years, Brighton began to make small purchases of socket shoulder screws from Lakshmi.

Thereafter, in 1990, Brighton and Lakshmi entered into a written exclusive dealing agreement whereby the parties agreed that within North America, Lakshmi would sell alloy steel dowel pins exclusively to Brighton.[2] At the same time, Brighton proceeded to loan Lakshmi $250,000 to acquire the necessary machinery to expand its operations and issued a purchase order significantly in excess of that amount for the purchase of dowel pins.

In addition to the above agreement, Brighton alleges that Lakshmi and Brighton had an oral exclusive agreement whereby Lakshmi would commit to sell its shoulder screws exclusively to Brighton within North America if Brighton, in return, would commit to purchasing all of its shoulder screw demand from Lakshmi.[3] E Z challenges the existence of this exclusive agreement. For purposes of this motion, we shall give the Plaintiff the benefit of the doubt and assume that no such agreement existed.[4]

By late 1991 and early 1992, Brighton transferred all of its purchase orders for socket shoulder screws to Lakshmi. Over the next few years, Brighton made several additional loans and advanced orders to Lakshmi in order to assist Lakshmi in its effort to expand its socket shoulder screw manufacturing abilities. In

---

[2] The sale of dowel pins is not the subject of this litigation.

[3] Brighton states that there were two exceptions to this agreement. Namely, that Lakshmi could also sell shoulder screws to Heads & Threads and Reynolds.

[4] The court suspects that an exclusive agreement never existed in part because there was no written agreement, at least not until April or June 1995, when a consulting agreement was executed. The defendants also conceded at oral argument, that for purpose of this motion, the court may assume that no exclusive agreement existed.

addition, Brighton provided advice and assistance in upgrading Lakshmi's production operations. Mr. Rosenstein also visited Lakshmi's plant on three separate occasions, each time meeting with Lakshmi's engineers to discuss means of improving Lakshmi's efficiency and quality. The court has no doubt that Brighton enabled Lakshmi to enter the market and become a productive manufacturer and exporter, thereby increasing the availability of socket shoulder screws in the United States.

In March of 1993, E Z placed their first purchase order with Lakshmi. However, E Z claims that Lakshmi began soliciting the business of E Z for socket screw products as early as 1989. By the end of 1994, Lakshmi supplied 95% of E Z's shoulder screws, and E Z had terminated most of its business with other suppliers.[5]

Beginning on or about April 1994, Rajesh Jain and Mr. Rosenstein were negotiating prices for shoulder screws sold to Brighton. Mr. Jain wrote Brighton asking for price increases on, among other things, shoulder screws. Through their correspondence, Lakshmi revealed to the first of Brighton's knowledge, that Lakshmi was selling shoulder screws to E Z. Thereafter, Brighton and Lakshmi reached an agreement whereby Lakshmi agreed to terminate sales to E Z. As a result, in June 1995, Lakshmi terminated its business with E Z, and consequently E Z initiated this lawsuit.

NEW JERSEY ANTITRUST ACT

█ E Z's antitrust claim is premised primarily upon Section 56:9–3 of the New Jersey Antitrust Act. The Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." *N.J.S.A.* 56:9–3. The purpose of

---

[5] Although EZ purchased 95% of its stock from Lakshmi, the purchases were on a much smaller scale compared to the purchases made by Brighton. For example, EZ's purchase orders ranged from $99,514.00 in the April 1993—March 1994 fiscal year, and increasing to $267,527 in the April 1994—March 1995 fiscal year. On the other hand, Brighton's purchase orders have been consistently more significant for the last three years.

the New Jersey Antitrust Act is to prevent trade-restraining practices which ordinarily deprive the public of benefits derived from the competitive market. *Ideal Dairy v. Farmland Dairy,* 282 *N.J.Super.* 140, 175, 659 *A.*2d 904 (App.Div.1995), *certif. denied* 141 N.J. 99, 660 *A.*2d 1197 (1995); *Boardwalk Properties v. BPHC,* 253 *N.J.Super.,* 515, 530, 602 *A.*2d 733 (App.Div.1991); *see also Glasofer Motors v. Osterlund, Inc.,* 180 *N.J.Super.* 6, 433 *A.*2d 780 (App.Div.1981).

The New Jersey Supreme Court has held that the State Antitrust Act is not preempted under the Commerce Clause by federal antitrust enactments. *State v. Lawn King, Inc.,* 84 *N.J.* 179, 191, 417 *A.*2d 1025 (1980). Rather, the New Jersey Antitrust Act must be construed "in harmony with ruling judicial interpretations of comparable federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." *N.J.S.A.* 56:9–18. *See also Ideal Dairy,* 282 *N.J.Super.* at 175, 659 *A.*2d 904. The federal analog of *N.J.S.A.* 56:9–3 is Section 1 of the Sherman Antitrust Act which contains virtually identical language.[6]

Vertical Restraints of Trade

██ There are two principal methods of evaluating whether a restraint of trade is unreasonable: the "per se" rule and the "rule of reason." *Ideal Dairy,* 282 *N.J.Super.* at 175, 659 *A.*2d 904.

The per se rule is only appropriate when it relates to conduct that is manifestly anticompetitive. "There are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. R. Co. v. United States,* 356 *U.S.* 1, 5, 78 *S.Ct.* 514, 518, 2 *L.Ed.*2d 545 (1958).

---

6 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1 (1996).

■ The rule of reason approach focuses on whether the challenged conduct adversely affects competition. *Ideal Dairy,* 282 *N.J.Super.* at 176, 659 *A.*2d 904. "The fact that a challenged restraint may have an injurious effect on an individual competitor is irrelevant." *Id.* This analysis requires the court to make a detailed inquiry into the relevant product and geographic markets and survey the effect of the challenged conduct or agreement on that market. *Id.*

■ In this case, defendants argue that E Z cannot prove an antitrust case under the rule of reason analysis without demonstrating the requisite injury to the marketplace. The fact that E Z has not engaged an expert to prove that injury, defendants argue, is fatal to Plaintiff's case. The court questioned E Z on this point at oral argument and E Z conceded that they would not be able to prove an antitrust case under the rule of reason standard. Likewise, this court holds, E Z would not be able to prove a claim under *N.J.S.A.* 56:9–4, Monopolies, which also requires a detailed analysis of the relevant marketplace. Nonetheless, plaintiff argues that the rule of reason standard does not apply to their case. Instead, plaintiff argues that defendants' conduct constitutes a vertical price restraint.[7]

■ It has been long established that vertical agreements to maintain prices and stifle competition are invalid. *Dr. Miles Medical Company v. John D. Park & Sons Company,* 220 *U.S.* 373, 400, 31 *S.Ct.* 376, 384–85, 55 *L.Ed.* 502 (1911). "A vertical restraint is not *per se* illegal ... unless it includes some agreement on price or price levels." *Business Electronics Corporation v. Sharp Electronics Corporation,* 485 *U.S.* 717, 108 *S.Ct.* 1515, 1516, 99 *L.Ed.*2d 808 (1988). Moreover, in *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 *U.S.* 36, 97 *S.Ct.* 2549, 53 *L.Ed.*2d 568

---

[7] Vertical restraints are restraints among persons at different levels of the market structure such as one between a manufacturer and its distributor. On the other hand, horizontal restraints are those among competitors at the same level of the market structure—among manufacturers or among distributors.

(1977), the Court held that vertical restraints are not per se illegal but rather, have a real potential to stimulate interbrand competition.[8] In that case, the court refused to extend per se illegality to vertical nonprice restraints, even where a manufacturer terminated a dealer pursuant to an exclusive territory agreement with another. *GTE Sylvania*, 433 *U.S.* at 58–59, 97 *S.Ct.* at 2562. The Court noted that "departure from the rule-of reason standard must be based on demonstrable economic effect rather than ... upon formalistic line drawing." *Id.*

■ Furthermore, the fact that a manufacturer and a distributor constantly communicate regarding prices and marketing strategy does not alone demonstrate concerted conduct to fix prices. *Monsanto Company v. Spray–Rite Service Corporation*, 465 *U.S.* 752, 104 *S.Ct.* 1464, 79 *L.Ed.*2d 775 (1984).

> The correct standard is that there must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Monsanto*, 465 *U.S.* at 753, 104 *S.Ct.* at 1466, 79 *L.Ed.*2d at 780.

In light of the above Supreme Court rulings, it is clear that in order for E Z to succeed on a vertical price fixing claim, they must prove that defendants, Brighton and Lakshmi, conspired to fix prices. In support of their assertion, plaintiff sets forth a litany of correspondence between Brighton and Lakshmi wherein the subject of prices charged by Lakshmi to Brighton and its competitors was discussed. Plaintiff alleges the following facts: (1) a letter dated April 25, 1994 where Mr. Jain advised Mr. Rosenstein that he had never sold dowel pins to the distributors mentioned, but "I

---

[8] *G.T.E. Sylvania* overruled *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 *S.Ct.* 1856, 18 *L.Ed.*2d 1249 (1967). The *Arnold, Schwinn* Court had extended the per se rule to nonprice vertical restrictions imposed by a supplier on its distributors.

Intrabrand competition is the competition among a class of resellers, often retailers, for sales of the same brand. Interbrand competition is the competition among competing brands.

did sell few shoulder screws ... and I always quoted prices at 30% higher to yours."; (2) a letter dated April 20, 1994 from Mr. Rosenstein to Mr. Jain, wherein Mr. Rosenstein states that "We [Brighton] have made a major, major investment to inventory shoulder screws and drive out the competition."; (3) a letter dated September 14, 1994, from Mr. Rosenstein to Mr. Lalit of Lakshmi, wherein Mr. Rosenstein states that "it is foolish to weaken our strong friendship and strong business commitments by taking orders from E–Z Socket, Reynolds, Socket Source, etc ..."; (4) correspondence dated February 1995, wherein Mr. Rosenstein and Mr. Jain discuss the prices charged by Lakshmi to Brighton's competitors, including a letter from Mr. Jain wherein he states "After my last telephonic talk with you, to cut the supplies to [redistributor—name deleted], I sent them a new price list by adding 15% to the price list that I sent to you and in return they sent the same back to us confirming their acceptance to the same ..."; (5) a faxed letter dated June 8, 1995 from Mr. Rosenstein to Rajesh Jain, wherein Brighton agreed that in exchange for accepting new prices on dowel pins and shoulder screws, among other conditions, Lakshmi should in turn, "cancel and discontinue selling all products to E Z Socket, [redistributor—name deleted] and other competitors effective immediately." Brighton also stated that Lakshmi may continue to sell their products at higher prices to two other companies; namely, [redistributors—names deleted]; (6) Lakshmi terminated its business with E Z Sockets.

Upon review of the above-mentioned facts, it is clear that Brighton intended to "drive out the competition." Also, it appears that Brighton attempted to accomplish that goal by ensuring that Lakshmi sold to Brighton at lower prices than that charged to competitors and/or eliminate certain competitors completely. While at first blush defendants behavior may appear to be iniquitous, the facts do not add up to a violation of the law.

The fact that Brighton intended to stifle the competition, is not relevant for this motion. Plaintiff has not set forth sufficient evidence as required under *Business Electronics* that would indi-

cate that Brighton and Lakshmi have engaged in vertical price restraints. Although they might have agreed to terminate E Z as a distributor of Lakshmi's shoulder screw products, that agreement, without more, is remediless. Much like the situation in *Business Electronics*, "[t]here has been no showing here that an agreement between a manufacturer and a dealer to terminate a 'price cutter,' without a further agreement on the price or price levels ... tends to restrict competition and reduce output." *Business Electronics*, 485 *U.S.* at 726–27, 108 *S.Ct.* at 1520–21. *See Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 *F.2d* 1357, 1360 (10th Cir.1989) (holding that "in order for a complaint to adequately state a vertical price-fixing violation ... plaintiff must allege at least some facts which would support an inference that the parties have agreed that one will set the price at which the other will resell the product or service to third parties"); *Center Video Industrial Co., Inc. v. United Media, Inc.*, 995 F.2d 735 (7th Cir.1993) (holding that there was no vertical price restraint between a manufacturer and a dealer where there is no agreement between them to set a specific retail price or to maintain retail prices within a specific range); *Corrosion Resistant Materials Co. v. Steelite, Inc.*, 692 *F.Supp.* 407 (D.N.J.1988) (holding that there was no vertical price restraint where the distributor failed to establish express or implied agreement by manufacturer and its dealer to set prices after termination of distributor.) In our case, there was never any agreement regarding the "retail" price or price levels charged by Brighton or its competitors. Without such evidence, plaintiff cannot prove a per se violation of the antitrust law.

Nor do we find that fixing the wholesale prices sold by Lakshmi to distributors is the equivalent to price fixing or resale price maintenance.[9] *See DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 990 *F.2d* 1186 (11th Cir.1993), *certif. denied* 510 *U.S.* 1012, 114 *S.Ct.* 604, 126 *L.Ed.*2d 569 (1993). In that case, the

---

[9] Retail Price Maintenance ("RPM") is the common term for vertical price restraint.

court found evidence of an agreement between the supplier and one of its distributors to inflate distributors' end price of products destined for one particular large customer by eliminating price competition at the dealer level. *Id.* at 1200. Thus, by fixing the wholesale price at such an inflated level, and not accounting for expenses and market profits, the result, the court held, was the equivalent of "retail price maintenance". *Id.* However, the court correctly noted that "In general, of course, the fixing of wholesale prices poses no antitrust problem." *Id.*

Unlike in *DeLong*, here we have absolutely no evidence that Brighton and Lakshmi conspired to fix wholesale prices in order inflate the resale price to an end user. Moreover, here there is no evidence of fraud, which was conclusively present in *DeLong*. Instead, the court finds that Brighton and Lakshmi were merely negotiating the wholesale prices charged to certain distributors, without any reference to a particular end user.

Thus, we have established that the fact that Brighton intended to control the prices quoted by Lakshmi to other distributors is not equivalent to price fixing, nor does it demonstrate any harm to the competitive market, the very reason why the antitrust laws were enacted. Brighton may affirmatively protect itself in the marketplace so long as it does not engage in trade-restraining practices which ordinarily deprives the public of benefits derived from the competitive market. *See Ideal Dairy*, 282 *N.J.Super.*, at 175, 659 *A.*2d 904.

In addition, the court recognizes that Brighton invested a great deal of time and money to establish Lakshmi as an international competitive manufacturer. Brighton's competitors, while free to employ the same business strategy, chose instead to enjoy the fruits of Brighton's labor. The Supreme Court in *Business Electronics* eloquently stated the following:

[A]ll vertical restraints, including the exclusive territory agreement held not to be *per se* illegal in *GTE Sylvania*, have the potential to allow dealers to increase "prices" and can be characterized as intended to achieve just that. In fact, vertical nonprice restraints only accomplish the benefits identified in *GTE Sylvania* because they reduce intrabrand price competition to the point where the dealer's

profit margin permits provision of the desired services. As we described in *Monsanto:* "The manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesman or demonstrating the technical features of the product, and will want to see that 'free-riders' do not interfere." *Citations omitted;* (emphasis added).

*Business Electronics,* 485 *U.S.* at 728, 108 *S.Ct.* at 1521–22.

Therefore, in light of the law and public policies enunciated in the above cited cases, we find that there is no evidence of vertical price fixing as required by *Business Electronics* in order for a per se standard to be applied here. It follows that plaintiffs have not set forth sufficient evidence that would withstand a motion for summary judgment under *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 666 *A.*2d 146 (1995). By default, a rule of reason analysis should be implemented. However, at oral argument, the plaintiff conceded that the proofs are insufficient to withstand a rule of reason analysis. Moreover, the court found that expert testimony would be necessary to conduct a detailed market analysis. Because plaintiff has not engaged any such expert, this court is compelled to grant defendants motion for summary judgment on the antitrust count of the complaint.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE AND CONTINUING ECONOMIC RELATIONS

■ Defendants also seek to dismiss plaintiff's claim of tortious interference with prospective and continuing economic relations. E Z claims that Brighton unlawfully interfered with E Z's relationship with Lakshmi, causing the termination of that relationship and injury to E Z.

The leading case in New Jersey on tortious interference is *Printing Mart v. Sharp Electronics,* 116 *N.J.* 739, 563 *A.*2d 31 (1989). In *Printing Mart,* the New Jersey Supreme Court set forth the requisite elements of a claim for tortious interference with prospective economic advantage as follows: (1) plaintiff must have had a reasonable expectation of economic advantage; (2) defendant must have interfered intentionally and with malice; (3) defendant's interference must have caused the loss of Plaintiff's prospective gain; and (4) the injury must have caused damage.

*Printing Mart,* 116 *N.J.* at 751, 563 *A.*2d 31. Courts must determine whether a defendant's actions are equivalent to wrongful conduct or constitute privileged competitive efforts on a case-by-case basis. *Id.* at 756, 563 *A.*2d 31.

While a party does have a right to enjoy the fruits and advantages of its own labor without unjust interference, a party "has no right to be protected against competition." *Louis Kamm, Inc. v. Flink,* 113 *N.J.L.* 582, 587, 175 *A.* 62 (E. & A.1934); *see also, C.R. Bard v. Wordtronics Corp.* 235 *N.J.Super.* 168, 172, 561 *A.*2d 694 (1989). The *Restatement (Second) of Torts* § 768 sets forth the parameters within which a competitor may lawfully compete:

> Competition as Proper or Improper Interference (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.

This court must determine whether Brighton fulfills the above requirements in order to be protected by this privilege.

First, it is undisputed that E Z and Brighton are competitors with regard to the distribution of shoulder screw products. Second, the court has already decided that defendants did not create an unlawful restraint of trade. Third, aside from an alleged antitrust violation, plaintiff has proffered no evidence that suggests that defendants employed wrongful means. Wrongful means includes violence, fraud, intimidation, misrepresentation, criminal or civil threats, and/or violations of the law. *C.R. Bard,* 235 *N.J.Super.* at 174, 561 *A.*2d 694. We have already concluded that the defendants did not violate the antitrust law, and there is no evidence of any other wrongful means, like those enunciated in *C.R. Bard.*

Finally, this court is satisfied that Brighton's motive was to protect the return on their investment in Lakshmi and to prevent any free riders from taking advantage of their contributions, which in effect enhances competition. Both parties acknowledge the fact that through Brighton, Lakshmi was able to grow and prosper in the international market. It is therefore understandable that because of their substantial financial commitment, Brighton would want to suppress the competition. However, unless Brighton employed wrongful means to do so, Brighton is insulated from this tortious interference claim under the cloak of competitor's privilege. Therefore, because plaintiff has not presented any evidence of wrongful means other than that alleged in their antitrust claim, and in light of the standard for summary judgment set forth in *Brill,* this court must grant defendants' motion for summary judgment on the tortious interference claim.