**LIGGETT GROUP INC., Plaintiff,**

v.

**R.J. REYNOLDS TOBACCO CO., Defendant.**

No. Civ.A. 00–994(AJL).

United States District Court,
D. New Jersey.

May 30, 2000.

---

Michael R. Griffinger, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, PC, Newark, New Jersey, Kenneth A. Gallo, Joseph J. Simons, Brian K. O'Bleness, Aimèe D. Latimer, Cliffor Chance, Rogers & Wells LLP, Washington, DC, for plaintiff.

Alan E. Kraus, Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, New Jersey, Randolph S. Sherman, Liza Karsai, Jesse Sands, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City, Daniel R. Taylor, Jr., Mark A. Stafford, Kilpatrick Stockton LLP, Winston Salem, North Carolina, for defendant.

## OPINION

LECHNER, District Judge.

This is an action brought by the plaintiff, Liggett Group, Inc. ("Liggett"), against defendant, R.J. Reynolds Tobacco Company ("RJR"). On 3 March 2000, Liggett filed a complaint (the "Complaint") that alleges, *inter alia*, violations of the Federal antitrust laws in connection with the distribution and sale of discount cigarettes. *See* Complaint. Liggett specifically alleges RJR violated Section 1 ("Section 1") of the Sherman Act, 15 U.S.C. § 1, Section 4 ("Section 4") and Section 16 ("Section 16") of the Clayton Act, 15 U.S.C. §§ 15 and 26. *See id.* at ¶¶ 11, 31–39 and pp. 13–14. On 12 April 2000, RJR filed an answer to the Complaint.

Currently pending is a motion, filed by RJR, to transfer the action (the "Motion to Transfer") to the United States District Court for the Middle District of North Carolina (the "Middle District of North Carolina"), pursuant to 28 U.S.C. § 1404(a) ("Section 1404(a)").[1] For the reasons set out below, the Motion to Transfer is granted; the action is transferred for all purposes to the Untied States District Court for the Middle District of North Carolina.

### Background

#### A. *Parties*

Liggett is a corporation organized and existing under the laws of the State of Delaware. *See id.* at ¶ 9. Liggett, is also an indirect, wholly-owned subsidiary of Brooke Group Holding, Inc. *See id.* Liggett maintains substantially all of its manufacturing facilities in or near Durham, North Carolina. *See id.* The premium cigarette brand manufactured by Liggett is Eve®. *See id.* The "mass-market" discount cigarette brand manufactured by Liggett is Pyramid®. *See id.* In addition, Liggett manufactures various "private label," "control label" and generic cigarettes.[2] *See id.*

---

1. In support of the Motion to Transfer, RJR submitted: a notice of motion to transfer venue to the United States District Court for the Middle District of North Carolina, defendant's memorandum of law in support of motion to transfer venue to the United States District Court for the Middle District of North Carolina (the "Moving Brief"), declaration of Guy M. Blynn in support of Defendant's motion to transfer venue (the "Blynn Declaration"), defendant's reply memorandum in further support of motion to transfer venue to the United States District Court for the Middle District of North Carolina (the "Reply Brief"), and a reply declaration of Evan A. Toulon (the "Toulon Declaration").

 In opposition to the Motion to Transfer, Liggett submitted: plaintiff's memorandum of law in opposition to defendant's motion to transfer venue (the "Opp. Brief"), declaration of Harold J. Petch in opposition to defendant's motion to transfer venue (the "Petch Declaration"), and a declaration of Kenneth A. Gallo, Esq. in opposition to defendant's motion to transfer venue (the "Gallo Declaration").

2. While Liggett vaguely referenced the manufacture of "private label," "control label" and

RJR is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business located in Winston–Salem, North Carolina. *See id.* at ¶ 10. It appears RJR transacts business in New Jersey through its sales office located in Middlesex County. *See id.* RJR manufactures cigarettes for sale through retail outlets throughout the United States under various brand names, including Camel®, Winston®, Doral® and the Forsyth family brands. *See id.*

### B. *Facts*

As mentioned, Liggett primarily alleges violations of the Federal antitrust laws as the basis of the instant action. *See id.* at ¶ 1. For example, Liggett alleges RJR illegally contracted and conspired with cigarette retailers to "restrain trade by engaging in a pervasive scheme of anticompetitive conduct." *See id.* At issue is the "Every Day Low Price" (the "EDLP") plan promulgated by RJR and the EDLP contracts (the "EDLP Contracts") utilized by RJR to implement the program. *See id.* at ¶ 2. Liggett alleges the purpose and effect of the EDLP plan "has been to impede the functions of the marketplace by reducing consumer choice, raising prices paid by consumers, and foreclosing competition in the manufacture and sale of discount cigarettes throughout the United States."[3] *Id.*

As stated in the Complaint, it appears cigarettes are sold by manufacturers to wholesalers who, in turn, sell cigarettes to retailers throughout the United States. *See id.* at ¶ 13. In addition, it appears cigarettes are directly sold by manufacturers to large retailers located in the United States. *See id.* Liggett alleges retailers "typically" do not buy cigarettes through any other means. *See id.* at ¶ 15. As a result, the Complaint alleges Liggett, like other cigarette manufactures, maintains direct relationships with its retailers. *See id.* In an effort to foster its relationship with retailers, Liggett alleges it provides direct discount payments to retailers designed to reduce the retail price of its products and make those products competitively priced to the consumer. *See id.*

Liggett alleges the relevant market effected by the EDLP plan is the manufacture and sale of discount cigarettes throughout the United States. *See id.* at ¶ 14. Liggett alleges that because of the "substantial" price disparity between discount and premium tobacco products (cigarettes, pipe tobacco and cigars), consumers of discount cigarettes do not consider premium tobacco products to be viable substitutes for discount cigarettes. *See id.* Liggett further alleges manufacturers of cigarettes view discount and premium cigarettes as distinctly different products. *See id.* Liggett alleges, moreover, that industry analysts view discount cigarettes as an entirely separate market. *See id.*

Liggett alleges RJR is one of four major cigarette manufacturers in the United States and accounts for an estimated 30% of the discount cigarette sales in the country. *See id.* at ¶ 16. The Complaint further alleges the importance of RJR in the discount cigarette market is magnified by the "high barriers" unique to the entry into the market for the manufacture and sale of discount cigarettes in the United States. *See id.* at ¶ 17. For example, Liggett alleges the "entry barriers" include the "requirements for extensive distribution organizations, large capital outlays for sophisticated production equipment, substantial inventory investment and costly promotional spending." *Id.*

In addition, the entry into the discount cigarette market has recently become more difficult in light of a master settle-

---

generic cigarettes in the Complaint, Liggett did not provide any explanation or details concerning the distribution and, or, retail sale of these products.

3. Liggett alleges the EDLP plan instituted by RJR extends to a "substantial number of cigarette retailers in the United States." Complaint at ¶ 13.

ment agreement (the "Master Settlement Agreement") formulated between cigarette manufacturers and various State attorneys general. *See id.* Liggett specifically alleges because of the Master Settlement Agreement, cigarette advertising has been "substantially" curtailed, making it difficult for companies to enter the discount cigarette market. *See id.* Liggett, moreover, alleges cigarette manufacturers now face significant uncertainty due, in part, to "unresolved liability issues and the fact that the overall demand for cigarettes has been slowly declining in recent years and appears likely to continue to decline." *See id.* The Complaint also alleges "the primary basis of competition in the discount cigarette market is based on price, and without the ability to undercut the price of incumbents, a new entrant [into the discount cigarette market] is almost certain to fail." *Id.* at ¶ 19.

As mentioned, the instant action challenges the EDLP plan developed by RJR and implemented through the EDLP Contracts entered into between RJR and various cigarette retailers. *See id.* at ¶ 2. Liggett alleges the EDLP Contracts require retailers to insure that no competitive cigarettes are priced below RJR brand cigarettes. *See id.* In this regard, the Complaint alleges RJR accomplishes its price-fixing "scheme" by requiring that cigarette retailers, *inter alia*, raise the prices of competing discount cigarettes in return for "substantial payments" (the "EDLP Payments"). *See id.* at ¶¶ 2, 21.

Liggett further alleges that despite RJR competitors offering retailers "substantial discounts" (for the purpose of reducing the price of their product) the EDLP plan prohibits retailers from lowering the price of competing discount cigarettes, regardless of manufacturer discounts. *See id.* at ¶ 2. Liggett alleges the EDLP Payments are made to retailers to compensate them for the increased price and resultant decrease in sales of competing discount cigarettes. *See id.* at ¶ 21. "The EDLP Contracts thus have the effect of preventing retailers from accepting any discounts from other manufacturers (Liggett) that would lower the price of competing product below that of the RJR product." *Id.* at ¶ 2.

The Complaint further alleges the anticompetitive effects of the EDLP plan are "intensified" by the enforcement mechanism implemented by RJR. *See id.* at ¶ 22. Liggett alleges that retailers are required to rely upon their individual RJR sales representative to explain and construe the obligations of the retailers under the EDLP Contracts. *See id.*

> EDLP Contracts specifically provide that the opinion of the RJR representative is final regarding contract interpretation. Cigarette retailers, fearing a loss of EDLP Contract payments or other punitive measures by RJR, succumb to obligations as set forth by their RJR representatives. The requirements enforced by RJR representatives often go beyond the express terms of the EDLP Contracts.

*Id.*

In particular, Liggett alleges that the EDLP Contracts provide in relevant part:

> Retailer, if given certain pricing protection against other competitive products, agrees to offer and promote [RJR Discount Cigarette Brand] as its primary cigarette in the lowest price category at the everyday low price at all times and to provide [Retailer's Store] with a minimum of one prominent price communication sign, as well as preferred merchandising space and locations as compared to other products in the low price category.

*Id.* at ¶ 23. (alterations in the Complaint).

As a result of the implementation of the EDLP plan, the Complaint alleges RJR and participating retailers have increased prices to consumers and excluded competition from other discount cigarette manufacturers. *See id.* at ¶ 26. "Competing discount cigarette makers have been deprived of effective retail sales outlets for

their products. By suppressing price competition, and consequently, sales of competitive discount products, RJR has maintained higher prices, and increased its own sales and profits at the expense of the consuming public and competing manufacturers." *Id.* Liggett, moreover, alleges

> But for RJR's EDLP Contracts, there would be more competition in the market for the manufacture and sale of discount cigarettes in the United States. RJR's unlawful conduct has caused and is causing significant injury to competition in the relevant market by, *inter alia:* (a) setting minimum retail prices for discount cigarettes and fixing related prices between RJR and Liggett's discount cigarettes; (b) materially excluding and/or impeding Liggett and other cigarette makers from competing on price for the sale of discount cigarettes through retail outlets by interfering with the manner in which retail outlets price competing cigarette products; (c) raising prices on discount cigarettes, reducing output and/or otherwise distorting the competitive and efficient operation of the retail cigarette market that would otherwise prevail but for RJR's unlawful practices; and (d) raising the costs of other cigarette makers by hindering their efforts to compete on price.

*Id.* at ¶ 27. Liggett further alleges it is unable to maintain or increase sales "not because of weakened consumer demand but because of the chokehold [sic] that RJR has placed at the retail level of the relevant market, preventing Liggett from competing on price and substantially reducing the volume of Liggett's sales and profits." *Id.* at ¶ 28.

In Count one of the Complaint, Liggett alleges, *inter alia,* the EDLP Contracts, as enforced by RJR, create a "naked restraint" on interbrand price competition which constitutes a *per se* violation of Section 1 of the Sherman Act. *See* Count One, ¶¶ 31–34.[4]

Liggett alleges RJR instituted a similar suit against Philip Morris Inc. ("Philip Morris"), in the Middle District of North Carolina (the "RJR North Carolina Case").[5] Liggett posits that RJR alleged Philip Morris engaged in an interbrand price-fixing scheme. *Id.* at ¶ 33. Liggett specifically alleges "RJR admits that similar contracts imposed by Philip Morris significantly restrict interbrand price competition." *Id.* (quoting the RJR North Carolina Case Memorandum in Support of Motion for Preliminary Injunction at 2). The Complaint, moreover, alleges that RJR further argued that "[Philip Morris's] substantial prohibition against competitive price promotions is even more antithetical to competition than *per se* unlawful vertical price-fixing, since the restraint here operates to stifle interbrand and not simply intrabrand price competition." *Id.* (quoting the RJR North Carolina Case Memorandum in Support of Motion for Preliminary Injunction at 29).

In Count two of the Complaint, Liggett alleges the EDLP Contracts have resulted in "actual detrimental effects," which include price increases for discount cigarettes in the United States; "and[,] or[,] the effective exclusion of Liggett and other competitors from sales of discount cigarettes." *Id.* at ¶ 36. Liggett further alleges these "detrimental effects" indicate the EDLP Contracts constitute a violation of

---

**4.** Section 1 provides in relevant part:

"Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony...."

15 U.S.C. § 1.

Note 97 to the Sherman Act states in relevant part:

*Per se* doctrine generally:

> In a suit brought under this section, plaintiff shoulders [the] burden of proving unreasonableness of restraint unless the challenged activity is *per se* violative of this section.

*Id.* at n. 97.

**5.** *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.* (M.D.N.C.2000).

Section 1 of the Sherman Act, 15 U.S.C. § 1. *See id.*

Liggett, moreover, alleges RJR does not have a legitimate business purpose for instituting and enforcing the EDLP Contracts. *See id.* at ¶ 38. In the alternative, Liggett alleges that even assuming RJR has a legitimate business purpose for the EDLP Contracts, that purpose is "far outweighed by the excessive burdens imposed thereby, and any legitimate business purposes could be accomplished by less restrictive means." *Id.*

In Count three of the Complaint, Liggett alleges the "detrimental effects" resulting from the EDLP Contracts constitute a *per se* violation of the New Jersey Antitrust Act (the "New Jersey Antitrust Act"), N.J.S.A. 56:9-3.[6] *See id.* at ¶ 41. In the alternative, the Complaint alleges that the conduct of RJR constitutes a "rule of reason violation of the New Jersey Antitrust Act."[7] *Id.* (citing N.J.S.A. 56:9-3).

In count four of the Complaint, it is alleged Liggett had, and continues to have, a reasonable expectation of economic benefit from its business relationships with cigarette retailers. *See id.* at ¶ 45. Liggett also alleges RJR "knew of the existence of Liggett's expectation of economic benefit ... [and] intentionally and wrongfully engaged in acts and conduct that interfered with Liggett's expectation of economic benefit...." *Id.* at ¶ 46. Liggett

further alleges it would have received its anticipated economic benefit "but for RJR's interference." *See id.* at ¶ 47. Liggett, moreover, alleges that the complained-of conduct of RJR is not privileged and is without justification. *See id.* at ¶ 48.

Finally, Liggett demands that RJR be enjoined from its practice of "soliciting, entering into and enforcing exclusionary contracts with retailers for the distribution and sale of discount cigarettes, and from engaging in other practices designed to foreclose and exclude Liggett from the relevant market, pursuant to Section 16 of the Clayton Act." *See id.* at ¶¶ 34, 39, 43, pp. 13, ¶ b (citation omitted). Liggett also seeks compensatory damages, as provided for by Section 4 of the Clayton Act. *See id.* at pp. 13, ¶ d.

*Discussion*

RJR argued the instant action should be transferred to the Middle District of North Carolina, pursuant to Section 1404(a), because the Middle District of North Carolina is the forum where both Liggett and RJR maintain their principal place of business and where the "central events giving rise to this suit occurred...." *See* Moving Brief at 1, 11; Blynn Declaration at ¶¶ 3, 6, 8, 9–11; Reply Brief at 1–7; Toulon Declaration at ¶¶ 2–3. In addition, RJR argued that to the extent the EDLP plan caused Liggett to experience reduced sales

---

**6.** The New Jersey Antitrust Act states:

> Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful.

N.J.Stat.Ann. § 56:9–3.

> Note 2 to the New Jersey Antitrust Act provides in relevant part:
>
> According to [the] *per se* method of evaluation of whether restraint of trade is unreasonable, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and, therefore, illegal without elaborate inquiry as to [the] precise harm they have caused or business excuse for their use.

*Id.* at note 2 (citing *E Z Sockets, Inc. v. Brighton–Best Socket Screw Mfg. Inc.*, 307 N.J.Super. 546, 704 A.2d 1364 (1996), *aff'd* 307 N.J.Super. 438, 704 A.2d 1309 (App.Div. 1997)).

**7.** Note 2 to the New Jersey Antitrust Act further provides:

> According to [the] rule of reason approach of evaluating whether restraint of trade is unreasonable, [the] fact that challenged restraint may have [an] injurious effect on [an] individual competitor is irrelevant; [a] court must make [a] detailed inquiry into [the] relevant product and geographic markets and survey [the] effect of [the] challenged conduct or agreement on that market.

*Id.* (same).

of its discount cigarettes, the impact of the EDLP plan would be most noticeably felt in the Middle District of North Carolina (the location of the sole manufacturing facility and principal place of business of Liggett). *See* Moving Brief at 2, 14; Blynn Declaration at ¶¶ 2, 11; Reply Brief at 2–3, 7.

By contrast, Liggett argued that the "plaintiff's choice of a proper forum is a paramount consideration," and "RJR has offered no adequate reason to negate Liggett's choice of this [c]ourt as the appropriate forum to try RJR's unlawful conduct." Opp. Brief at 9. Specifically, Liggett argued that of its five "autonomous strategic business units," (a three-branch marketing and sales unit, a manufacturing unit and an executive unit), one of the three co-equal headquarters for marketing and sales is located in New Jersey.[8] *See* Opp. Brief at 12, 18; Petch Declaration at ¶¶ 3–11; Gallo Declaration at 5. Liggett, therefore, maintained that its field sales managers and representatives from the NSBU "are *likely* to be witnesses in any trial regarding the scope, nature, and effects of RJR's EDLP program." Gallo Declaration at ¶ 5 (emphasis added). Liggett, however, also asserted that "[b]ecause of the structure of [Liggett] ... and based on our investigation, we anticipate that *roughly equal numbers* of Liggett's relevant witnesses and documents will be drawn from New Jersey, North Carolina, and Texas." *Id.* at ¶ 6 (emphasis added). In addition, Liggett argued that RJR is a New Jersey corporation and maintains a regional sales office in New Jersey. *See* Opp. Brief at 4.

Liggett, moreover, argued that because the EDLP plan operates on a national scale, causing Liggett injury "in every state in the nation," non-party witnesses could *potentially* include "approximately 57,000 cigarette retailers nationwide...." *See* Opp. Brief at 1, 10 (emphasis added). In this regard, Liggett identified twenty-three *potential* non-party retailer witnesses. *See id.;* Gallo Declaration at ¶ 2. In addition, Liggett asserted that these *potential* non-party witnesses "*may possess* information related to the [EDLP] program's effects on discount cigarette prices." Gallo Declaration at ¶ 2 (emphasis added). As mentioned, Liggett also argued the majority of relevant party proof will be produced from "outside of North Carolina," as the "field offices of both parties will be the source of a significant number of relevant witnesses and documents." *See* Opp. Brief at 11–12; Petch Declaration at ¶ 8; Gallo Declaration at ¶ 5. Finally, Liggett contended New Jersey has a strong interest in "preventing businesses from engaging in anticompetitive conduct within its borders, especially when that conduct harms New Jersey consumers." *See* Opp. Brief at 14.

### I. *Standard of Review Under Section 1404(a)*

Section 1404(a) authorizes a District Court to transfer a case to any other district where venue is proper "[f]or the convenience of the parties and witnesses, in the interests of justice...." 28 U.S.C. § 1404(a).[9] The purpose of Section 1404(a) is to avoid the waste of time, energy and money and, in addition, to safeguard litigants, witnesses and the public

---

**8.** It appears in or about 1997, Liggett reorganized the structure of its operations. *See* Petch Declaration at ¶ 3. Specifically, it appears Liggett created five autonomous, "co-equal" strategic business units to "better reflect the company's business focus." *Id.* As a result of the reorganization, Liggett is composed of three marketing and sales units headquartered in North Carolina, New Jersey and Texas, and a manufacturing unit and an executive unit, both of which are located in North Carolina. *See id.*

**9.** Section 1404(a) provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a).

against avoidable inconvenience and expense. *See Lexecon Inc., et al. v. Milberg Weiss Bershad Hynes & Lerach, et al.,* 523 U.S. 26, 33, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998); *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995); *In re Emerson Radio Corp.,* 52 F.3d 50, 55 (3d Cir. 1995); *SmithKline Beecham Corp. v. Geneva Pharmaceuticals, Inc.,* 2000 WL 217642 at *1 (E.D.Pa. Feb. 11, 2000); *Westcode, Inc. v. RBE Electronics, Inc.,* 2000 WL 124566 at *7 (E.D.Pa. Feb. 1, 2000); *Ricoh Co. Ltd. v. Honeywell, Inc.,* 817 F.Supp. 473 (D.N.J.1993); *American Tel. & Tel. Co. v. MCI Communications Corp.,* 736 F.Supp. 1294, 1305 (D.N.J. 1990).

■ There are three factors to consider when determining whether to transfer a matter (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice. *See* 28 U.S.C. § 1404(a); *Jumara,* 55 F.3d at 879; *Geneva Pharmaceuticals, Inc.,* 2000 WL 217642 at *1; *Larami Ltd. v. Yes! Entertainment Corp.,* 244 B.R. 56, 60–61 (D.N.J.2000); *RBE Electronics,* 2000 WL 124566 at *7; *Hudson United Bank v. Chase Manhattan Bank of Conn., NA,* 832 F.Supp. 881, 887 (D.N.J.1993), *aff'd,* 43 F.3d 843 (3d Cir. 1994); *Honeywell,* 817 F.Supp. at 479. The transfer analysis is not limited, however, to these factors.

The decision to transfer must incorporate· "all relevant factors to determine whether on balance the litigation [will] more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Geneva Pharmaceuticals, Inc.,* 2000 WL 217642 at *1 (quoting *Jumara,* 55 F.3d at 879) (citation omitted); *Yes! Entertainment,* 244 B.R. at 60–61; *Tischio v. Bontex, Inc.,* 16 F.Supp.2d 511, 519 (D.N.J.1998); *Rappo-*

*port v. Steven Spielberg, Inc.,* 16 F.Supp.2d 481, 498 (D.N.J.1998); *Hudson United Bank,* 832 F.Supp. at 888.

■ As mentioned, the alternative forum proposed by RJR in the instant action is the Middle District of North Carolina. *See* Moving Brief at 1; Blynn Declaration at ¶ 1; Reply Memorandum at 1; Toulon Declaration at ¶ 1. As a preliminary matter, it must be determined whether the proposed transferee venue is one in which the case "might have been brought." *See* 28 U.S.C. § 1404(a); *Jumara,* 55 F.3d at 879; *In re Emerson Radio Corp.,* 52 F.3d at 55; *RBE Electronics,* 2000 WL 124566 at *7; *AT & T,* 736 F.Supp. at 1305.

A. *The Instant Matter Could Have Been Brought in the Middle District of North Carolina*

As mentioned, the instant action is primarily based upon Federal antitrust laws. *See* Complaint at ¶¶ 31–39. Liggett, moreover, alleges jurisdiction is based upon 28 U.S.C. § 1331 ("Section 1331") and 28 U.S.C. § 1337(a) ("Section 1337").[10] *See* Complaint at ¶ 11. Because jurisdiction is founded on Federal question jurisdiction, 28 U.S.C. § 1391(b) ("Section 1391(b)") governs venue for this action. *See* 28 U.S.C. § 1391(b). Section 1391(b) provides:

(a) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situat-

---

10. Section 1331 provides:
 The [D]istrict [C]ourts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.
 28 U.S.C. § 1331.
 Section 1337(a) provides in relevant part:

The [D]istrict [C]ourts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies....
28 U.S.C. § 1337(a).

ed, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

*Id.* For purposes of Section 1391, "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." *See* 28 U.S.C. § 1391(c). *See also Jumara,* 55 F.3d at 879; *Doran v. Credit Bureau Associates,* 2000 WL 288326 at *2 (E.D.Pa. March 17, 2000).

In the instant action, the Compliant alleges venue is properly laid in the District of New Jersey "under [Section 4 and Section 12] of the Clayton Act ... and under [Section 1391(b)], RJR being found in and transacting business in this District." Complaint at ¶ 12. Alternatively, it appears venue is also appropriate in the Middle District of North Carolina; RJR maintains its principal place of business in Winston–Salem, North Carolina. *See* Blynn Declaration at ¶¶ 2–3; Moving Brief at 3, 12. *See also* 28 U.S.C. § 1391(b). As discussed below, upon review of the Complaint and declarations submitted in support of the Motion to Transfer, it appears a substantial portion of the events giving rise to this action occurred in the Middle District of North Carolina. *See* Blynn Declaration at ¶¶ 2, 8–11; Toulon Declaration at ¶ 3; Moving Brief at 5–7, 11–14; Reply Brief 6–10.

Based upon the foregoing, it appears pursuant to Section 1391(b)(1) and Section 1391(b)(2) the instant action "might have been brought" in the proposed transferee forum, the Middle District of North Carolina. *See* 28 U.S.C. § 1404(a).

A defendant seeking a transfer must also establish that an adequate alternative forum exists for the dispute. *See Williams v. Monroe Emergency Physicians, P.C.,* 1999 WL 124398 at *1 (E.D.Pa. Feb. 10, 1999) (citing *Lacey v. Cessna Aircraft Company,* 862 F.2d 38, 43 (3d Cir.1988)) (hereinafter "*Lacey I*"); *O'Laughlin v. Consolidated Rail Corp.,*

1999 WL 124393 at *1 (E.D.Pa. Feb. 9, 1999) (same); *Tischio,* 16 F.Supp.2d at 519. "Ordinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction," unless "the remedy offered by the other forum is clearly unsatisfactory." *Bhatnagar v. Surrendra Overseas Ltd., et al.,* 52 F.3d 1220, 1227 (3d Cir.1995) (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419, *reh'g denied,* 455 U.S. 928, 102 S.Ct. 1296, 71 L.Ed.2d 474 (1982)).

As mentioned, RJR is a corporation with its principal place of business located in North Carolina. *See* Blynn Declaration at ¶ 2–3. RJR, therefore, is amenable to process in North Carolina. *See* 28 U.S.C. § 1391(c). Because the proposed forum offers a satisfactory remedy for the parties, the Middle District of North Carolina is an adequate alternative forum. *See Bhatnagar,* 52 F.3d at 1227.

**B.** *Private and Public Interests*

Transfer analysis under Section 1404(a) is a flexible and individualized analysis and must be made on the unique facts presented in each case. *See Piper,* 454 U.S. at 249–250, 102 S.Ct. 252; *RBE Electronics,* 2000 WL 124566 at *7 (citing *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29–30, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)); *Lacey I,* 862 F.2d at 43; *Tischio,* 16 F.Supp.2d at 518. A determination that transfer to another jurisdiction is appropriate represents an " 'exercise[ ] of structured discretion by trial judges appraising the practical inconveniences posed to the litigants and the court should a particular action be litigated in one forum rather than another.' " *Lawrence v. Xerox Corp.,* 56 F.Supp.2d 442, 449 (D.N.J.1999) (quoting *Honeywell,* 817 F.Supp. at 479)(quoting *Lony v. E.I. Du Pont de Nemours & Co.,* 886 F.2d 628, 632 (3d Cir.1989) (hereinafter "*Lony I*")). There is no rigid rule governing the determination by a court; " '[e]ach case turns on its facts.' " *Lacey I.,* 862 F.2d at 43 (quoting *Piper,* 454 U.S. at 255–56, 102

S.Ct. 252); *Tischio*, 16 F.Supp.2d at 519; *Rappoport*, 16 F.Supp.2d at 498. Added to these factors are the "interests of justice" and the impact on judicial administration of maintaining related actions in separate fora. *See Jumara*, 55 F.3d at 879; *Tischio*, 16 F.Supp.2d at 519; *Rappoport*, 16 F.Supp.2d at 498; *Honeywell*, 817 F.Supp. at 479.

In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), the Court listed various factors which should be considered when deciding if a certain action should be transferred.[11] These factors fall into two broad categories. The first category includes factors relating to the "private interests" of the parties in the context of the litigation. The types of private interests may include the choice of forum of the plaintiff, the ease of access to sources of proof, availability of compulsory process over unwilling witnesses, the cost of attendance of willing witnesses, obstacles to a fair trial and the possibility of a jury view of the premises. *See Gulf Oil*, 330 U.S. at 508, 67 S.Ct. 839; *Geneva Pharmaceuticals, Inc.*, 2000 WL 217642 at *1; *Smithkline Beecham Corp. v. Apotex Corp. Apotex, Inc.*, 2000 WL 15074 at *2 (E.D.Pa. Jan. 4, 2000); *Harbuck v. Aramco, Inc., et al.*, 1999 WL 999431 at *8 (E.D.Pa. Oct. 21, 1999). Other private interests may include the preference of the defendant, whether the claim arose elsewhere, and the location of books and records. *See Jumara*, 55 F.3d at 879.

The second category consists of the "public interest" in the administration of courts and the adjudication of cases. Public interests include court congestion and other administrative difficulties, placing the burden of jury duty on those having the closest ties to the action, the local interest in having a matter adjudicated at home and the familiarity of the forum court with the applicable law. *See Gulf Oil*, 330 U.S. at 508–09, 67 S.Ct. 839 *Jumara*, 55 F.3d at 879; *Geneva Pharmaceuticals, Inc.*, 2000 WL 217642 at *1; *Apotex*, 2000 WL 15074 at *2; *Aramco*, 1999 WL 999431 at *8; *Tischio*, 16 F.Supp.2d at 520; *Rappoport*, 16 F.Supp.2d at 498–99; *Honeywell*, 817 F.Supp. at 480; *AT & T*, 736 F.Supp. at 1307.

■ The moving party has the burden of persuasion on a motion to transfer. *See Jumara*, 55 F.3d at 879; *Lony II*, 935 F.2d at 609; *Lony I*, 886 F.2d at 633; *Lacey I*, 862 F.2d at 44; *Geneva Pharmaceuticals, Inc.*, 2000 WL 217642 at *1; *Yes! Entertainment*, 244 B.R. at 61; *Apotex*, 2000 WL 15074 at *2; *Tischio*, 16 F.Supp.2d at 520; *Rappoport*, 16 F.Supp.2d at 499; *Tranor v. Brown*, 913 F.Supp. 388, 391 (E.D.Pa.1996); *Honeywell*, 817 F.Supp. at 480. The burden is not on the plaintiff to show the proposed alternative forum is inadequate. *See Lacey I*, 862 F.2d at 44; *Xerox*, 56 F.Supp.2d at 451; *Tischio*, 16 F.Supp.2d at 520; *Rappoport*, 16 F.Supp.2d at 499; *Honeywell*, 817 F.Supp. at 480. Rather, the burden is

---

11. *Gulf Oil* involved a motion to dismiss under the doctrine of *forum non conveniens*. Courts routinely look to the Gulf Oil factors for guidance on Section 1404(a) motions. *See Xerox*, 56 F.Supp.2d at 450; *NCR Credit Corp. v. Ye Seekers Horizon, Inc.*, 17 F.Supp.2d 317, 320 (D.N.J.1998); *Tischio*, 16 F.Supp.2d at 519 n. 9; *Honeywell*, 817 F.Supp. at 479 n. 16. As well, Third Circuit decisions such as *Lony I, Lony v. E.I. DuPont de Nemours & Co.*, 935 F.2d 604, 609 (3d Cir.1991) (hereinafter *"Lony II"*) and *Lacey I*, which involve motions to dismiss under the doctrine of *forum non conveniens*, are relevant to a motion to transfer under Section 1404(a).

District Courts have broader discretion to transfer an action under Section 1404(a), than to dismiss under the common law doctrine of *forum non conveniens*. *See Norwood v. Kirkpatrick*, 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789 (1955); *Joint Stock Soc. Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court v. Heublein, Inc.*, 936 F.Supp. 177, 191 (D.Del.1996) (citation omitted); *Ruccolo v. BDP, Int'l, Inc.*, No. 95–2300, 1996 WL 735575, at *17 & n. 9 (D.N.J. Mar. 25, 1996); cf. *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170 (3d Cir.), *reh'g denied en banc* (3d Cir.1991) (*"Lacey II"*); *Mediterranean Golf, Inc. v. Hirsh*, 783 F.Supp. 835, 840–41 (D.N.J.1991).

on the moving party to show the proposed alternative forum is not only adequate, but also more appropriate than the present forum. *See Jumara,* 55 F.3d at 879; *Lacey I,* 862 F.2d at 43–44; *Xerox,* 56 F.Supp.2d at 451; *Tischio,* 16 F.Supp.2d at 520; *Rappoport,* 16 F.Supp.2d at 499; *Honeywell,* 817 F.Supp. at 480.

In making its determination, a " '[D]istrict [C]ourt is required to develop adequate facts to support its decision and to articulate specific reasons for its conclusion that transfer to another venue is appropriate.' " *Xerox,* 56 F.Supp.2d at 451 (quoting *Tischio,* 16 F.Supp.2d at 520 (quoting *Lacey I,* 862 F.2d at 39)). *See also Hudson United Bank,* 832 F.Supp. at 888; *Honeywell,* 817 F.Supp. at 480. The moving party must submit sufficient information in the record to facilitate the appropriate analysis and to meet its burden of persuasion. *See Xerox,* 56 F.Supp.2d at 451; *Honeywell,* 817 F.Supp. at 480. *See also Piper,* 454 U.S. at 258, 102 S.Ct. 252; *Rappoport,* 16 F.Supp.2d at 499. This inquiry does not, however, necessarily require extensive investigation. *See Van Cauwenberghe v. Biard,* 486 U.S. 517, 529, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988); *Xerox,* 56 F.Supp.2d at 451; *Tischio* 16 F.Supp.2d at 520; *Rappoport,* 16 F.Supp.2d at 499.

The inquiry into the interests of the parties may be resolved by an examination of the affidavits submitted by the parties. *See Van Cauwenberghe,* 486 U.S. at 529, 108 S.Ct. 1945; *Lacey I,* 862 F.2d at 44; *Tischio* 16 F.Supp.2d at 520; *Rappoport,* 16 F.Supp.2d at 499; *Honeywell,* 817 F.Supp. at 480. From that basis, the contentions of the parties and the relevant private and public interests must be considered and balanced. *See Xerox,* 56 F.Supp.2d at 451; *Lacey I,* 862 F.2d at 45; *Tischio,* 16 F.Supp.2d at 520; *Hudson United Bank,* 832 F.Supp. at 888. As

mentioned, in support of the Motion to Transfer, RJR submitted two declarations concerning the implementation and monitoring of the EDLP plan by RJR executives in North Carolina. *See* Blynn Declaration; Toulon Declaration. Liggett similarly submitted two declarations in opposition to the Motion to Transfer. *See* Petch Declaration; Gallo Declaration.[12]

### 1. Private Interests

The primary private interests in the instant action are the choice of forum by Liggett and the convenience of the available districts with regard to sources of proof, namely, the witnesses and documentary evidence.

### a. Choice of Forum

■ In this Circuit, the choice of forum by a plaintiff is a "paramount concern" in deciding a motion to transfer venue. *See Lony I,* 886 F.2d at 633; *Lacey I,* 862 F.2d at 45–46; *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.), *cert. denied,* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971); *Xerox* 56 F.Supp.2d at 452; *Danka Funding L.L.C. v. Page, Scrantom, Sprouse, Tucker & Ford PC,* 21 F.Supp.2d 465, 474–75 (D.N.J.1998); *Tischio,* 16 F.Supp.2d at 521 (quoting *Honeywell,* 817 F.Supp. at 480); *Rappoport,* 16 F.Supp.2d at 499. *See also Shore Slurry Seal, Inc. v. CMI Corp.,* 964 F.Supp. 152, 156 (D.N.J.1997) (stating choice of proper forum by plaintiff is "paramount consideration" in transfer analysis); *Newcomb v. Daniels, Saltz, Mongeluzzi & Barrett, Ltd.,* 847 F.Supp. 1244, 1246 (D.N.J.1994) (stating choice of forum by plaintiff is accorded "significant weight"). The choice of forum is "entitled to greater deference" when a plaintiff chooses its home forum. *See Xerox,* 56 F.Supp.2d at 452 (quoting *Tischio,* 16 F.Supp.2d at 521 (quoting *Honeywell,* 817 F.Supp. at 480)). *See also*

---

**12.** Upon review of the Gallo Declaration, it appears the paragraphs are improperly designated. Specifically, Liggett has omitted the numeral "three" and as a result the paragraphs are designated 1–2 and 4–14. All references to the Gallo Declaration are to the paragraphs as they appear in the Gallo Declaration.

*Piper*, 454 U.S. at 255–56, 102 S.Ct. 252; *Lony I*, 886 F.2d at 633–34; *Lacey I*, 862 F.2d at 45; *Rappoport*, 16 F.Supp.2d at 499.

Indeed, "unless the balance is strongly tipped in favor of the defendant, the plaintiff's choice of forum should not be disturbed." *Xerox*, 56 F.Supp.2d at 452; *Honeywell*, 817 F.Supp. at 480. *See also Lony II*, 935 F.2d at 609; *Lacey I*, 862 F.2d at 44. The choice of forum by a plaintiff is considered to be presumptively correct. *See Lacey I*, 862 F.2d at 45; *Xerox*, 56 F.Supp.2d at 452; *Tischio*, 16 F.Supp.2d at 521; *Rappoport*, 16 F.Supp.2d at 499; *Hudson United Bank*, 832 F.Supp. at 888; *Honeywell*, 817 F.Supp. at 480; *Mediterranean Golf*, 783 F.Supp. at 842. This presumption, however, is not dispositive. *See Xerox*, 56 F.Supp.2d at 452, n. 6 (quoting *Tischio*, 16 F.Supp.2d at 521). *See also Lony I*, 886 F.2d at 634; *Lacey I*, 862 F.2d at 45–46; *AT & T*, 736 F.Supp. at 1306.

The choice of forum by a plaintiff is simply a preference; it is not a right. *See Xerox*, 56 F.Supp.2d at 452, n. 6; *Tischio*, 16 F.Supp.2d at 521; *Honeywell*, 817 F.Supp. at 480; *AT & T*, 736 F.Supp. at 1306. The choice of forum is not the only factor to be considered in a transfer analysis. *See Jumara*, 55 F.3d at 880 (considering other factors); *Lony I*, 886 F.2d at 634; *Xerox*, 56 F.Supp.2d at 452, n. 6; *Honeywell*, 817 F.Supp. at 480; *AT & T*, 736 F.Supp. at 1306. Indeed, in certain circumstances, the choice of forum by a plaintiff is afforded less weight. *See Xerox*, 56 F.Supp.2d at 452, n. 6.

■ One situation where deference to the choice of forum is curbed is where the plaintiff has not chosen a home forum. *See Piper*, 454 U.S. at 255–56 n. 23, 102 S.Ct. 252; *Lony I*, 886 F.2d at 634; *Mediterranean Golf*, 783 F.Supp. at 842. Another situation is where the choice of forum by a plaintiff has little connection with

the operative facts of the lawsuit. *See Danka Funding*, 21 F.Supp.2d at 475 (indicating that "plaintiff's choice, however, is entitled to less deference where the operative facts of a lawsuit occurred outside the forum selected by plaintiff."); *Tischio*, 16 F.Supp.2d at 521 (stating that deference is curbed where "the choice of forum . . . has little connection with the operative facts of the lawsuit."); *Newcomb*, 847 F.Supp. at 1246; *Honeywell*, 817 F.Supp. at 481 (stating "[w]hen the central facts of a lawsuit occur outside the forum state, a plaintiff's selection of that forum is entitled to less deference."). *See also National Micrographics Sys. v. Canon U.S.A.*, 825 F.Supp. 671, 681 (D.N.J.1993); *AT & T*, 736 F.Supp. at 1306.

■ In the instant action, Liggett generally argued that its choice of a proper forum is a "paramount consideration" that "should not be lightly disturbed." Opp. Brief at 9. As mentioned, however, "the choice of forum by a plaintiff is not dispositive in the transfer analysis, even if venue is proper where the suit was filed." *Xerox*, 56 F.Supp.2d at 452, n. 6 (quoting *Tischio*, 16 F.Supp.2d at 521); *Honeywell*, 817 F.Supp. at 480 (quoting *AT & T*, 736 F.Supp. at 1306). To hold otherwise would "collapse any difference between [S]ections 1404 and 1406 . . . as well as render Congress' codification of the common law doctrine of *forum non conveniens* meaningless." *Tischio*, 16 F.Supp.2d at 521 (emphasis added).

In particular, Liggett argued New Jersey is a "logical" forum because it is home to Liggett's northern strategic business unit (the "NSBU"), one of only three such units nationwide.[13] *See* Opp. Brief at 1; Petch Declaration at ¶¶ 3–4. Liggett, moreover, argued the NSBU "markets and sells cigarettes in the most densely populated and retail intensive geographic region of the country, which includes the

---

13. As mentioned, it appears Liggett is comprised of five components: an executive unit, manufacturing unit and three co-equal marketing and sales units (headquartered in New Jersey, Texas and North Carolina). *See* Toulon Declaration at ¶¶ 3–4.

[S]tates of New Jersey, New York, Delaware, Pennsylvania, Ohio, Indiana, Michigan, Maine, Vermont, New Hampshire, Connecticut, Rhode Island and Massachusetts." Opp. Brief at 1–2, 4; Petch Declaration at ¶ 11.

By contrast, RJR argued that "Liggett is not on its home turf in New Jersey— and for that reason alone, Liggett's choice of forum is afforded less weight." Moving Brief at 11 (internal punctuation omitted). It is undisputed that New Jersey is not the "home" forum of Liggett. *See* Complaint at ¶ 9 (stating "substantially all of [Liggett's] manufacturing facilities [are] located in or near Durham, North Carolina.").[14] *See also* Blynn Declaration at ¶¶ 2, 5, 7, 11. More importantly, Liggett failed to mention, much more allege, the significance of the NSBU to the instant action in its Complaint. *See* Complaint at ¶ 9; Count Three (alleging violations of the New Jersey Antitrust Act). *Cf.* Gallo Declaration at ¶¶ 5–6; Petch Declaration at ¶¶ 3–19. Indeed, the allegations of the Complaint are singularly focused on the national, rather than regional, impact of the EDLP plan. *See e.g.* Complaint at ¶¶ 1, 4, 14, 20, 27. As a result of the national focus of the allegations in the Complaint, Liggett further argued that "roughly equal numbers" of Liggett representatives located throughout the United States will be relevant witnesses at trial. *See* Gallo Declaration at ¶ 6.

Because New Jersey is not the "home" forum of Liggett, the choice of forum by Liggett is afforded less weight. *See Piper*, 454 U.S. at 255–56, n. 23, 102 S.Ct. 252; *Lony I*, 886 F.2d at 634; *Mediterranean Golf*, 783 F.Supp. at 842. *See also Xerox*, 56 F.Supp.2d at 452 n. 6.

RJR also argued the presumption afforded Liggett, as a plaintiff, that its choice of forum is the proper forum is further diluted because New Jersey "has little connection with the operative facts of the lawsuit...." Moving Brief at 11. In this regard, RJR argued the EDLP plan was "conceived at [RJR's] corporate headquarters in Winston–Salem and is administered nationally from Winston–Salem." Blynn Declaration at ¶ 8. In addition, RJR argued that "approximately 57,000 retail outlets throughout the United States have chosen to participate in some form of the EDLP program...." *Id.* RJR explained that the 57,000 participating retailers represent approximately 19% of retail outlets nationwide and of those participating retailers, only 2% are located in New Jersey. *Id.* RJR, moreover, established that participating retailers in North Carolina, alone, outnumber participating retailers in New Jersey by 3:1. *See* Toulon Declaration at ¶ 4.

RJR further asserted it has four sales regions which divide the United States. *See id.* It appears one of the regions encompasses the northeast (the "Northeast Sales Area") while another services the south (the "Southern Sales Area").[15] RJR, moreover, explained that approximately 22,000 retailers participate in the EDLP plan in the Southern Sales Area, compared to approximately 17,000 retailers in the total Northeast Sales Area. *See* Blynn Declaration at ¶ 8.

In further support of its argument that the operative facts of the instant action are not centered in New Jersey, RJR submitted correspondence from Liggett to RJR,

**14.** In addition, the 1998 SEC Form 10–K (the "1998 SEC Form 10–K") filed by Liggett indicates that "Liggett's products are distributed from a central distribution center in Durham, North Carolina...." *See* 1998 SEC Form 10–K, attached as Ex. 1 to the Blynn Declaration.

**15.** Upon review of the Toulon Declaration, it appears the Northeast Sales Area includes Connecticut, Delaware, the District of Colum-

bia, Indiana, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, most of West Virginia and Vermont. *See* Toulon Declaration at n. 2. The Southern Sales Area includes Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, half of Texas and Virginia. *See id.* at n. 1.

in which Liggett lodged formal protests against certain sales practices employed by RJR—namely the EDLP plan. *See* Blynn Declaration at ¶ 11; Ex. 4, attached to the Blynn Declaration. None of the correspondence, however, made reference to either the implementation of the EDLP plan in New Jersey, or the NSBU, or the Liggett sales representatives employed throughout the northeast, or the retailers and, or, customers in New Jersey. *See id.* Indeed, one letter, dated 21 May 1996, ("the 21 May 1996 Letter") specifically referenced "similar conduct" occurring in "St. Louis" and in the "western North Carolina market." *See* 21 May 1996 Letter, attached as Ex. 4 to the Blynn Declaration.

In addition, RJR stated that because Liggett alleges it has "sold significantly fewer cigarettes" as a result of the EDLP plan, *see* Complaint at ¶ 4, the "alleged negative effect on Liggett would have its most centralized impact on Liggett's manufacturing facility in Durham, North Carolina." Blynn Declaration at ¶ 11.

The arguments offered by Liggett are unavailing. For example, in light of the approximately 57,000 participating retailers nationwide (only 2% of which are located in New Jersey), it is difficult to assign any relevance to the mere assertion that because 80,000 retailers sell cigarettes in the northern United States, this litigation should remain in New Jersey. Noticeably, Liggett does not indicate whether any of the 10,500 retailers called on by the NSBU representatives have been approached by RJR, much more that they have implemented the EDLP plan and are subject to an EDLP Contract.

The declarations submitted on behalf of Liggett, moreover, appear to belie the Liggett argument that the central facts giving rise to the instant action stem from New Jersey. Liggett asserted that the NSBU calls on approximately "10,500 cigarette retailers in the northern United States." *See* Petch Declaration at ¶ 11. Liggett, however, also asserted that each "field representative [from the Western Strategic

Business Unit—located in Texas] calls on approximately the same number of retail accounts as representatives in the NSBU." *Id.* at ¶ 14.

Liggett, moreover, asserted that the Southern Strategic Business Unit, located in North Carolina, "has about forty field representatives [who] are assigned to that office. Each field representative calls on approximately the same number of retail accounts as representatives in the NSBU." *Id.* at ¶¶ 17–18. As mentioned, lead trial counsel for Liggett stated: "Because of the structure of the company and based on our investigation, we anticipate that roughly equal numbers of Liggett's relevant witnesses and documents will be drawn from New Jersey, North Carolina, and Texas." Gallo Declaration at ¶ 6.

Finally, as mentioned, the allegations in the Complaint indicate the EDLP plan extends throughout the United States and is not unique to New Jersey. *See eg.* Complaint at ¶¶ 1, 4 ("The purpose and effect of RJR's illegal conduct has been to impede the functions of the marketplace by reducing consumer choice, raising prices paid by consumers, and foreclosing competition in the manufacture and sale of discount cigarettes throughout the United States.... The program has already had a substantial effect on the price of discount cigarettes across the United States....").

RJR, for the purposes of the Motion to Transfer, has established that the operative facts for this litigation are not centered in New Jersey. RJR established that the EDLP plan was not only developed and implemented in North Carolina, but is currently monitored from North Carolina as well. *See* Blynn Declaration at ¶¶ 8–9. As a result, because the operative facts for this litigation are not centered in New Jersey, the choice of New Jersey as the forum by Liggett is entitled to less deference. *See Lony I,* 886 F.2d at 634; *Danka Funding,* 21 F.Supp.2d at 475; *Tischio,* 16 F.Supp.2d at 521; *Honeywell,* 817 F.Supp. at 481.

b. *Access to Proof*

The second relevant factor under the private interest analysis is the convenience of the available districts concerning the witnesses and the documentary evidence of both parties. As the Supreme Court has stated:

> To examine 'the relative ease of access to sources of proof' and the availability of witnesses, the [D]istrict [C]ourt must scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of the evidence cited by the parties are critical, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action.

*Van Cauwenberghe*, 486 U.S. at 528, 108 S.Ct. 1945 (quoting *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. 839). *See Xerox*, 56 F.Supp.2d at 449.

In this action, the parties do not dispute the characterization of the issue. This action involves claims for antitrust violations on a national level, pursuant to the Federal antitrust laws. *See* Complaint at ¶¶ 1, 11, 31–34, 35–36, pp. 13a–e.[16] The issues relating to RJR's alleged Federal antitrust violations require analysis of facts, documents and testimony concerning the purpose, implementation and effect of the EDLP plan and the EDLP Contracts. As demonstrated by the factually specific declarations submitted by RJR, the development of these facts is more easily undertaken in North Carolina than in New Jersey.

i. *Convenience of the Parties*

█ It has been observed that "from an economic standpoint it certainly makes sense to conduct a trial ... where only one party and witnesses have to travel rather than where both parties have to travel." *Honeywell*, 817 F.Supp. at 484 (citations omitted). In considering the "convenience of the parties," District Courts focus on the relative physical and financial condition of the parties. *See Jumara*, 55 F.3d at 879; *Simon v. Ward*, 80 F.Supp.2d 464, 470 (E.D.Pa.2000); *Hillard v. Guidant Corp.*, 76 F.Supp.2d 566, 568 (M.D.Pa. 1999). Significantly, the principal place of business of both parties is located in North Carolina. *See* Complaint at ¶¶ 9–10; Blynn Declaration at ¶ 2.

It appears a trial in the instant action will necessarily require employees of both parties to travel to either New Jersey or North Carolina.[17] *See* Petch Declaration at ¶¶ 5–19; Gallo Declaration at ¶ 6; Toulon Declaration at ¶¶ 3–4; Blynn Declaration at ¶ 4. Because the principal place of business of both parties is located in North Carolina and the EDLP plan is implemented and monitored by RJR executives in North Carolina, it appears the transfer of this action to the Middle District of North Carolina does not impose an excessive burden on either Liggett or RJR.[18]

**16.** As mentioned, Liggett also alleges violations of the New Jersey Antitrust Act, N.J.S.A. 56:9–3, *see* Complaint at ¶¶ 40–43, and brought a claim for tortious interference with business relations, *see id.* at ¶¶ 44–48. Liggett alleges the court has supplemental jurisdiction over these allegations pursuant to 28 U.S.C. § 1367(a). *See id.* at ¶ 11.

**17.** In this regard, RJR established that it has fourteen sales offices located throughout the United States. *See* Blynn Declaration at ¶ 4. Specifically, its sales offices are located in California, Colorado, Florida, Georgia, Illinois, Massachusetts, Michigan, Minnesota, New Jersey, North Carolina, Pennsylvania, Texas, Virginia and Washington. *See id.* It appears the RJR national sales offices are comprised of a total of 88 division sales managers, more than 700 sales representatives and 735 retail account representatives. *See id.* It appears the New Jersey regional sales office is staffed by only 8 full-time employees and 6 part-time employees. *See id.* It appears, moreover, that only 9 out of 1,435 RJR sales employees call on retail accounts in New Jersey. *See id.* RJR further established that the regional sales offices report to, and are supervised by, the RJR management team, located in Winston–Salem, North Carolina. *See id.* at ¶ 9.

**18.** In further support of transfer to North Carolina, RJR cites *GPA v. Liggett Group, Inc.*, 1994 WL 537017 (S.D.N.Y.1994). *See* Moving Brief at 4; Blynn Declaration at ¶ 14, Ex.

### ii. *Convenience of the Witnesses*

 In assessing the private interests of the parties, the convenience of potential witnesses also must be balanced. *See Lony I*, 886 F.2d at 636–37; *Lacey I*, 862 F.2d at 56–47; *Xerox*, 56 F.Supp.2d at 452; *Mentor Graphics Corp. v. Quickturn Design Systems, Inc.*, 77 F.Supp.2d 505, 510 (D.Del.1999) (stating that "the convenience of witnesses is often an important factor in a transfer inquiry."); *Tischio*, 16 F.Supp.2d at 522; *Honeywell*, 817 F.Supp. at 484.

When considering a motion to transfer, the Circuit distinguishes between party and non-party witnesses.[19] *See Jumara*, 55 F.3d at 879 (convenience of witnesses is only considered "to the extent that the witnesses may actually be unavailable for trial in one of the fora."); *Geneva Pharmaceuticals, Inc.*, 2000 WL 217642 at *2 (citing *Jumara*, 55 F.3d at 879); *Quickturn Design Sys.*, 77 F.Supp.2d at 510 (same); *Guidant*, 76 F.Supp.2d at 570 (same); *In re Consolidated Parlodel Litig.*, 22 F.Supp.2d 320, 323 (D.N.J.1998) (observing that convenience of non-party witnesses is accorded greater weight in the Section 1404(a) analysis than party witnesses); *National Property Investors VIII v. Shell Oil Co.*, 917 F.Supp. 324, 329 (D.N.J.1995).

In the instant action, RJR identified seventeen material party witnesses who have "specific knowledge" about either the formation and purpose of the EDLP plan or the implementation of the EDLP Contracts.[20] *See* Blynn Declaration at ¶ 10; Toulon Declaration at ¶ 3. Upon review of the declarations submitted in support of the Motion to Transfer, it does not appear RJR identified any non-party witnesses.

Liggett asserts that it is likely to offer twenty-three party witnesses. *See* Gallo Declaration at ¶ 5; Petch Declaration at ¶¶ 4–8. As mentioned, Liggett asserted that because of its structure, "roughly equal numbers of Liggett's relevant witnesses ... will be drawn from New Jersey, North Carolina, and Texas." Gallo Declaration at ¶ 6.

In addition, Liggett argued that as a result of a "thorough pre-filing investigation" it has identified "at least twenty-three *potential* non-party, retailer witnesses located within the compulsory power of the [c]ourt." *See id.* at ¶ 2 (emphasis added). Liggett further argued that these "witnesses *may* have relevant information and testimony regarding RJR's EDLP program. These twenty-three retailers participate in the RJR EDLP program and they *may possess information* related to the program's effects on discount cigarette prices." *Id.* at ¶ 3 (emphasis added). Liggett, moreover, argued that "based on [its] investigation of the facts underlying this case ... an additional seventy-one *potential* non-party, retailer witnesses lo-

---

6. In *GPA*, in response to suit being brought against Liggett in New York, Liggett filed a motion to transfer to the Middle District of North Carolina, pursuant to Section 1404. *See* Blynn Declaration at ¶ 14, Ex. 6. Although the motion to transfer was denied, Liggett argued, in part, that "[r]equiring Liggett to have virtually its entire senior management come to New York [from North Carolina] for trial would be unnecessarily disruptive to its operations." *See* Memorandum of Law in support of Defendant's Motion to Transfer, attached as Ex. 6 to the Blynn Declaration.

19. Party witnesses are presumed to be willing to testify in either forum despite any inconvenience, and therefore, the relative convenience of such witnesses carries little weight.

*See Quickturn Design Sys.*, 77 F.Supp.2d at 510 (stating that "the convenience of witnesses [who] are employees of a party carries no weight because the parties are obligated to procure their attendance at trial."); *Hillard v. Guidant Corp.*, 76 F.Supp.2d 566, 570 (M.D.Pa.1999).

20. RJR further argued that because the "overwhelming majority of the relevant documents and knowledgeable personnel are located in North Carolina .... [RJR] commits to exercise reasonable efforts to make any past and present employees not already located in North Carolina and who could have been subpoenaed by this [c]ourt reasonably available for trial in North Carolina, at its cost...." Blynn Declaration at ¶ 12.

cated in the northeastern states [ ] *may* have relevant information and testimony regarding RJR's EDLP program." *Id.* at ¶ 4 (emphasis added).[21]

RJR did not indicate, by affidavit or otherwise, whether material non-party witnesses will be inconvenienced if a trial is held in New Jersey. RJR, however, generally argued that "except for limited relevant EDLP documentation which may be in [RJR's] regional sales and field offices—of which New Jersey is only a minor slice—[RJR's] documents relevant to the challenged program are located at corporate headquarters ..., which is where [RJR's] witnesses most knowledgeable about the program work." *See* Moving Brief at 13.

Liggett merely argued that it has "identified at least twenty-three potential non-party, retailer witnesses who participate in the RJR program, and who are located within 100 miles of this [c]ourt." *See* Opposition Brief at 6 (citing Gallo Declaration at ¶ 2). Liggett, moreover, vaguely asserted that the "employees of these retailers *might* be witnesses in this case. New Jersey is the best forum for securing testimony from these *potential* witnesses employed by twenty-three retailers." *See id.* (emphasis added). Liggett further argued that non-party witnesses "include, among others, the approximately 57,000 cigarette retailers nationwide that participate in RJR's EDLP program."[22] *Id.* at 10.

Despite its argument that Liggett has identified "at least" twenty-three potential non-party retailer witnesses, Opp. Brief at 6, 10; Gallo Declaration at ¶¶ 2, 4, Liggett did not include the name of a single non-

party witness in either its brief or the two declarations submitted in opposition to the Motion to Transfer. In addition, far from explaining how the proposed testimony of the unidentified non-party witnesses is material to the instant action, Liggett merely asserted that "[t]hese witnesses *may* have relevant information and testimony regarding RJR's EDLP plan." *See* Gallo Declaration at ¶ 2 (emphasis added). *See also* Petch Declaration at ¶¶ 7–8, 15, 19.

While Liggett does not have the burden in a motion to transfer, simply arguing that non-party witnesses may include twenty-three unidentified northeastern retailers (or the approximately 57,000 retailers who participate in the EDLP plan nationally) who may have relevant information is not sufficient opposition. *See Lony I,* 886 F.2d at 636–37; *Lacey I,* 862 F.2d at 56–47; *Xerox,* 56 F.Supp.2d at 452; *Quickturn Design Sys.,* 77 F.Supp.2d at 510; *Tischio,* 16 F.Supp.2d at 522; *Honeywell,* 817 F.Supp. at 484.

iii. *Location of the Relevant Documents*

As mentioned, the "relative ease of access to sources of proof" is another private interest District Courts may consider when evaluating a motion to transfer. *See Van Cauwenberghe,* 486 U.S. at 528, 108 S.Ct. 1945 (quoting *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839); *Xerox,* 56 F.Supp.2d at 449–452.

In the instant action it does not appear access to documents favors either fora. On 12 April 2000, a scheduling conference (the "12 April 2000 Conference") was con-

---

21. While neither party argued material party witnesses will be unavailable if the instant litigation takes place in either New Jersey or North Carolina, it appears Liggett indicated that various employees who may provide relevant testimony will have to travel regardless of the fora. *See* Gallo Declaration at ¶ 6 (stating that "roughly equal numbers of Liggett's relevant witnesses and documents will be drawn from New Jersey, North Carolina, and Texas.").

22. In further support of its argument, Liggett asserted that New Jersey is serviced by Newark International Airport ("NIA"), while both Winston–Salem and Greensboro, North Carolina are serviced by Piedmont Triad International ("PTI"). *See* Opp. Brief at 11. As evidence of convenience, Liggett merely observed that NIA has nearly 500 daily domestic passenger flights compared to seventy-seven daily passenger flights at PTI. *See* Gallo Declaration at Ex. E.

**536**

ducted. Counsel indicated that this litigation might involve "hundreds of thousands of pages [of documents]." *See* 12 April 2000 Conference Tr. at 10:12–13. In response, it was suggested that the parties transfer and store all relevant documents on computer to better facilitate discovery and a trial.

Because the court and counsel have already explicitly addressed the "ease of discovery" concerning the instant action, the location of the documents should not impact on the analysis of whether to transfer this litigation to North Carolina. *See* Opp. Brief at 13; Reply Brief at 8. *Cf. Honeywell,* 817 F.Supp. at 486.

### 2. *Public Interests*

The public interest factors relevant to a determination the propriety of transfer include

> the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having a trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems and conflicts of laws or the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Lony I,* 886 F.2d at 640 (quoting *Piper,* 454 U.S. at 241 n. 6, 102 S.Ct. 252). Evaluation of the public interest factors include consideration of "the locus of the alleged culpable conduct ... and the connection of the conduct to plaintiff's chosen forum." *Lacey I,* 862 F.2d at 48 (quoting *Van*

*Cauwenberghe,* 486 U.S. at 529, 108 S.Ct. 1945). *See also Lony II* 935 F.2d at 612. As discussed below, it appears North Carolina has a greater interest in this litigation than New Jersey.

#### a. *Local Interests*

 As mentioned, both parties maintain their principal place of business in North Carolina. *See* Complaint at ¶¶ 9–10; Blynn Declaration at ¶ 2; Toulon Declaration at ¶ 2. North Carolina, therefore, has a compelling interest in regulating the conduct of businesses in its state.[23] *See Honeywell,* 817 F.Supp. at 486. As mentioned, it appears the EDLP plan was developed, has been, and is currently administered by RJR executives in North Carolina. *See* Blynn Declaration at ¶¶ 8–10; Toulon Declaration at ¶¶ 2–4. Because a substantial amount of the alleged culpable conduct occurred in North Carolina, not New Jersey, North Carolina has a stronger public interest in adjudicating this dispute. *See Lacey I,* 862 F.2d at 48; *Tischio,* 16 F.Supp.2d at 526; *Honeywell,* 817 F.Supp. at 486; *Mediterranean Golf,* 783 F.Supp. at 849–50.

#### b. *Burden of Jury Duty*

The burden of jury duty "ought not to be imposed upon the people of a community which have no relation to the litigation." *Tischio,* 16 F.Supp.2d at 526 (quoting *Honeywell,* 817 F.Supp. at 486 (quotations omitted). *See Ferens v. John Deere Co.,* 494 U.S. 516, 529–30, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (citing *Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. 839)). In the

---

**23.** Liggett's focus on the affect of the alleged anticompetitive conduct on New Jersey consumers is unavailing. *See* Opp. Brief at 14. As mentioned, Liggett does not discuss, much more focus, on New Jersey consumers in the Complaint. Rather, Liggett alleges the EDLP plan is violative of the Federal antitrust laws on a national level. *See e.g.* Complaint at ¶ 1 ("The purpose and effect of RJR's illegal conduct has been to impede the functions of the marketplace by reducing consumer choice, raising prices paid by consumers, and foreclosing competition in the manufacture and

sale of discount cigarettes *throughout the United States.*") (emphasis added). Liggett, moreover, specifically alleges that as a result of the EDLP plan it "has sold significantly fewer cigarettes." Complaint at ¶ 4.

It appears Liggett did not realign its sights on New Jersey consumers until it submitted its opposition to the Motion to Transfer. Indeed, even assuming the "local interests" in this litigation centered on retailers and consumers, it appears North Carolina has a more compelling interest in this matter than New Jersey.

instant action, "New Jersey jurors should not be burdened with adjudicating a matter concerning decisions and[,] or[,] conduct which occurred predominately outside the State of New Jersey." *Tischio,* 16 F.Supp.2d at 526; *Pain,* 637 F.2d at 792. Accordingly, this factor also weighs in favor of transfer to the Middle District of North Carolina.

### c. *Applicable Law*

"An important public interest factor is the desire to have the case tried before judges familiar with the applicable law." *Tischio,* 16 F.Supp.2d at 526. *See Lony I,* 886 F.2d at 642; *Lacey I,* 862 F.2d at 48 (citing *Piper,* 454 U.S. at 251, 102 S.Ct. 252); *Rappoport,* 16 F.Supp.2d at 501; *Hudson United Bank,* 832 F.Supp. at 888. As mentioned, the instant action is predicated on alleged violations of Federal antitrust law. *See* Complaint at ¶¶ 1, 11, 14, 20, 27, 31–39, 44–48, pp. 13a–e. While Liggett did not address the "applicable law" factor in either its opposition brief or declarations, it appears this public interest is not implicated because all District Courts are presumed "familiar with the applicable" Federal antitrust laws. *See Ricoh,* 817 F.Supp. at 486.

Liggett also alleged a violation of the New Jersey Antitrust Act. *See* Complaint at ¶ 41. Upon review of the Complaint, it appears this State law claim is derivative of the Federal antitrust law claims. As mentioned, Liggett simply alleges

> These detrimental effects on competition show that the EDLP [ ][C]ontracts constitute a *per se* violation of the New Jersey Antitrust Act.... In the alternative, RJR's conduct and EDLP program constitutes a rule of reason violation of the New Jersey Antitrust Act....

*Id.* (citations omitted).

The State antitrust claim, however, does not weigh in favor of denying the Motion to Transfer because the application of the New Jersey Antitrust Act mirrors Federal antitrust law. The New Jersey Antitrust Act specifically provides:

> This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those [S]tates which enact it.

N.J.S.A. 56:9–18. *See also Ideal Dairy Farms, Inc. v. Labatt, Ltd.,* 90 F.3d 737, 748 (3d Cir.1996) ("... New Jersey Antitrust Act provides that it should be construed in a manner consistent with [F]ederal antitrust law...."); *CSR Ltd. & CSR America Inc. v. Federal Ins. Co., et al.,* 40 F.Supp.2d 559, 566 (D.N.J.1998) ("New Jersey antitrust provisions are patterned after the Sherman Act, and [New Jersey courts have] previously acknowledged the significance of [F]ederal antitrust decisions in the interpretation of [New Jersey] antitrust law.") (alterations in the original, citations omitted).

### 3. *Interest of Justice*

Among the criteria in determining the advisability of transfer is whether transfer will promote the interests of justice. *See Jumara,* 55 F.3d at 878; *Tischio,* 16 F.Supp.2d at 526; *Honeywell,* 817 F.Supp. at 487. Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court and not simultaneously before two tribunals." *Honeywell,* 817 F.Supp. at 487 (quoting *Pall Corp. v. Bentley Labs., Inc.,* 523 F.Supp. 450, 453 (D.Del.1981)); *see Travelers Indemnity Co. v. E.F. Corp.,* No. 95–5660, 1997 WL 135819, at *8 (E.D.Pa. Mar. 17, 1997) ("The presence of a related case in the transferee forum is a powerful reason to grant a change of venue.") (internal citations omitted).

Transfer in such circumstances has numerous benefits:

> Cases can be consolidated before one judge thereby promoting judicial efficiency; pretrial discovery can be conducted in a more orderly manner; witnesses can be saved the time and

expense of appearing at trial in more than one court; and duplicative litigation involving the filing of records in both courts is avoided, thereby eliminating unnecessary expense and the possibility of inconsistent results.

*Honeywell,* 817 F.Supp. at 487; *Pall,* 523 F.Supp. at 453. "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that [Section] 1404 was designed to prevent." *Continental Grain Co. v. Barge FBL–585,* 364 U.S. 19, 26, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960).

"When two suits involving the same parties and subject matter are pending concurrently, the first-filed suit should have priority absent a showing that the balance of inconvenience favors transfer or unless there are special circumstances which justify giving priority to the second suit." *Honeywell,* 817 F.Supp. at 487 (citing *AT & T,* 736 F.Supp. at 1308); *see E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 974 (3d Cir.), *cert. granted in part,* 488 U.S. 992, 109 S.Ct. 554, 102 L.Ed.2d 581, (1988), *aff'd,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571, (1990).

The issue of whether the public interest in transferring a case to another district where a related case is pending was addressed in *AT & T. See* 736 F.Supp. at 1309–1313. In that case, AT & T presented the issue of whether the matter should be transferred to a district in which a related, but not identical, case had previously been filed. *See AT & T,* 736 F.Supp. at 1310. It was concluded:

> In th[at] case; the interests of justice, judicial administration and economy weigh heavily in favor of transfer to the District of Colombia. The retention of jurisdiction over the New Jersey Action would cause needless waste of judicial resources, not to mention the loss of time and expense of parties who will have to litigate related disputes in different fora.... The interests of justice, judicial administration and economy compel the result that one [D]istrict [C]ourt preside over these cases. Those interests are further enhanced by transfer to the District of Colombia because it will permit one appellate court to review the misrepresentations at issue and the remedy which will be awarded. To the extent the related case doctrine favors transfer of the New Jersey Action to the District of Columbia, that factor heavily outweighs the private interests of AT & T in maintaining the New Jersey Action in New Jersey.

*Id.* at 1312–13. *See also Todd Shipyards Corp. v. Cunard Line Ltd.,* 708 F.Supp. 1440, 1450 (D.N.J.1989) (finding that the existence of prior pending action outweighed arguments centered upon the convenience of the parties and witnesses).

In the instant action, RJR argued that two related North Carolina lawsuits provide "added impetus" for the transfer of this case to the Middle District of North Carolina. *See* Moving Brief at 7–8, 16–17; Reply Brief at 13–14.

RJR specifically argued that a suit instituted by Liggett, more than a decade ago, favors transfer of the instant action. *See* Moving Brief at 7 (citing *Liggett Group Inc. v. Brown & Williamson Tobacco Corp.,* 748 F.Supp. 344 (M.D.N.C.1990), *aff'd* 964 F.2d 335 (4th Cir.), *aff'd* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)) (the "Liggett North Carolina Case"). In support of the argument that the Liggett North Carolina Case is related to the instant action, RJR vaguely asserted that the previous suit centered on the pricing interaction between premium cigarettes and discount cigarettes and that the same "pricing interaction will also be a significant focus of this case...." *See id.*

Even assuming the most liberal application of the "related case doctrine," the Liggett North Carolina Case cannot be construed as related to this litigation. It cannot be considered in the balancing of

whether to transfer the instant case to the Middle District of North Carolina.

RJR, however, also argued that the RJR North Carolina Case favors transfer of this litigation. *See id.* at 8, 16–17 (citing *R.J. Reynolds Tobacco,* 60 F.Supp.2d 502 (M.D.N.C.1999)). In this regard, RJR asserted that because Liggett alleged in the Complaint that RJR premised its pending litigation against Philip Morris on a "similar" argument concerning the "naked restraint on interbrand price competition," *see* Complaint at ¶ 3, the instant action should be transferred to the Middle District of North Carolina. *See* Moving Brief at 8, 16–17. Although RJR disputed any similarity between the alleged anticompetitive conduct in the two pending actions, RJR argued that a court sitting in the Middle District of North Carolina should "assess who is right and thus maintain consistency of decisionmaking." Moving Brief at 17.

While the RJR North Carolina Case does not involve the same litigants as this litigation, it appears the two cases share similar, if not related, issues. As mentioned, Liggett alleges that the RJR North Carolina Case is based on a similar alleged violation of the Federal antitrust laws— "naked restraint on interbrand price competition." *See* Complaint at ¶ 3. Liggett served discovery requests on RJR in this litigation that demand the pleadings, deposition transcripts and documents in the RJR North Carolina Case. Specifically, Liggett requested

> [a]ll Documents constituting, referring to, or discussing any analysis, discussion, criticism, or comments regarding the purpose and/or effect of any Cigarette Business Competitors' business or trade practices, including, but not limited to those challenged by you in the [RJR North Carolina Case].

Liggett's First Request For Production of Documents, attached as Ex. 8 to the Blynn Declaration.

While it appears these cases are not candidates for consolidation, it appears

transferring this litigation to the proposed forum may well prevent the needless loss of time, expense and resources of the parties. *See Honeywell,* 817 F.Supp. at 487. In addition, because this litigation and the RJR North Carolina Case involve arguably similar issues concerning alleged violative pricing schemes and discount cigarettes, the interests of justice are further enhanced by allowing both cases to proceed before one tribunal rather than simultaneously proceeding before two. *See id.* As a result, the pending RJR North Carolina Case weighs in favor of the transfer of this litigation to the proposed forum. *See id.; AT & T,* 736 F.Supp. at 1312–13.

In sum, the transfer of this litigation to the Middle District of North Carolina will promote the interests of justice. As discussed, given the location of the principal place of business of both parties in North Carolina, the development and implementation of the alleged nationwide anticompetitive conduct in North Carolina and the lack of a relative strong nexus between the underlying dispute and New Jersey, the enhanced convenience offered by trial in the Middle District of North Carolina overcomes the limited deference given to the choice by Liggett of New Jersey as the forum for the litigation of this matter.

*Conclusion*

For the foregoing reasons, the Motion to Transfer is granted; the action is transferred to the Middle District of North Carolina.